*In re* MORSE'S ESTATE.

SIBLEY *v.* MORSE.

1. Wills — Contest — Testamentary Capacity — Opinion Evidence—Harmless Error.

No prejudice arises from allowing the attorney who drafted a will to state whether testator was mentally and physically competent to make his will, where the cross-examination and the instructions show that the jury were not left to infer that the attorney was attempting to testify to the legal conclusion, but that he was merely attempting to speak of the degree of intelligence and understanding of the testator.

2. Same—Evidence—Remoteness.

Where a medical witness who witnessed codicils to a will has testified regarding testator's testamentary capacity, questions on cross-examination regarding his treatment of testator for urethritis some 11 years prior to the execution of the codicils and 8 years prior to the execution of the will are properly excluded as too remote, irrespective of whether the heir, who is contesting, can waive testator's statutory privilege.

3. Witnesses — Competency — Religious Beliefs — Harmless Error.

Questions put to witnesses regarding their religious beliefs and practices *held*, not prejudicial as in contravention of section

10207, 3 Comp. Laws, it not appearing but that the statements of the witnesses were taken as true, nor that any argument was made to the jury upon the subject of religious belief.

4. WILLS — CONTEST — CHARACTER OF LEGATEE — EVIDENCE — MATERIALITY.

An offer of evidence in a will contest with respect to the character of a legatee, on the theory that the testator would not be likely to leave a legacy to a person of his character, is properly rejected, where no offer is made to show that testator had knowledge of the fact, and the question is not confined to the period of testator's life.

5. SAME—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

That testator's business adviser, when spoken to about making a will, advised that it be not postponed too long, and, at testator's request, took a memorandum of the terms of the will, does not show undue influence, such adviser in no way profiting by the terms of the will, and there being nothing to show that he advised with respect to a single provision.

6. SAME—INSANE DELUSIONS.

Where contestant admits that he advised with several people with respect to having a guardian appointed for testator, and it appears that testator had knowledge of contestant's views, contestant cannot claim that if testator believed contestant was attempting to have a guardian placed over him such belief was an insane delusion, and if it affected the making of his will the will was void.

7. SAME—PROVISIONS OF WILL—NATURAL JUSTICE.

Instructions respecting the presumptions indulged against a will, the provisions of which are against natural justice, and the likelihood of such a will being the result of undue influence or unsound mind, examined, and *held*, as favorable to contestant as the law permits.

8. TRIAL—REQUESTS TO CHARGE—NECESSITY OF GIVING.

There is no error in refusing requests to charge, the substance of which, so far as they are correct statements of legal principles, are sufficiently covered by the general charge.

Error to Oakland; Smith, J.   Submitted June 19, 1906. (Docket No. 37.)   Decided December 3, 1906.

Judson L. Sibley presented for probate the last will and

testament of John W. Morse, deceased. The will was allowed in the probate and circuit courts, and Rollin J. Morse, contestant, brings error. ˙Affirmed.

*James H. Pound* and *Perry & Stockwell* (*George E. ˙Eckert,* of counsel), for appellant.

*Patterson & Patterson,* for appellee.

*Morse & Locke,* for legatee Porter.

MONTGOMERY, J.   John W. Morse died on the 19th of March, 1903, at the age of 77 years, leaving an estate consisting of 400 acres of land, stock, tools, and personal property, and notes and mortgages; the aggregate of the inventory being about $31,500.   He had but one son, the contestant, Rollin J. Morse.   His numerous relatives consisted of brothers, sisters, and nieces.   His son, Rollin, was at the time of his death 50 years old, married, and living in the city of Detroit, while the deceased lived on the farm in the township of Novi, Oakland county.   Rollin had received a liberal education, and was an attorney at law.   It is apparent from the whole record that the relations between the father and son were not cordial. The second wife of deceased died in 1895, and from that time until the death of John W. Morse the son was rarely at the home.

John W. Morse had living with him before the death of his second wife, one Edith Bell, a young woman, who at the time was 22 years of age and upwards.   She had been with the family for some years before, acting as domestic and housekeeper, and continued in that relation up to the time of Mr. Morse's death.   The son at the time of the death of his stepmother seems to have conceived the idea—upon what seems to be very slight foundation—that Mrs. Morse had been murdered by Edith Bell, and it is open to inference that his suspicion went so far as to include his father.   He also suspected that illicit relations existed between his father and this young woman, and on

146 MICH.—30.

the trial of his case testifies to circumstances coming within his observation tending to show that fact. A disagreement arose between the father and the son over the question of putting away this housekeeper. An interview was had at the residence of a neighbor, in which the son in effect accused his father of illicit relations with Edith Bell, and coupled this accusation with the one against Edith Bell, charging her with having been the cause of his stepmother's death. Whatever justice there may have been in the first charge, the latter, as heretofore stated, was based upon a very flimsy foundation, and from this date the relations between father and son were strained.

In 1898 John W. Morse, after conferring with Judson L. Sibley, who had been his friend and adviser for many years, gave to Sibley a memorandum of the terms of a will which he desired to make. The two then made an appointment with John H. Patterson, an attorney at Pontiac, and on the 25th of October went together from Novi, a distance of about 20 miles, to Pontiac, and went to the office of Mr. Patterson. Mr. Patterson, after a private interview with Mr. Morse, prepared the will in question in this case. It was signed and executed in the presence of these two witnesses and Abiram Parker, president of the First Commercial Bank of Pontiac, and a long time business acquaintance of Mr. Morse.

The will bequeathed to contestant, Rollin J. Morse, for the term of his natural life, the net use and income of 160 acres of land known as the "Homestead," and provided that at his death the homestead should go to his children, if any, and, if no issue survived him, then to his next of kin. He also bequeathed all household goods, stock, tools, harvested grain, and produce on the farm absolutely to contestant, on the condition that he pay to the executor the sum of $200. He gave to his nephew Frank Morse a life estate in 80 acres of land; to his niece, Mary Ackley, a life estate in 80 acres of land; to his nephew, John Porter, a life estate in 80 acres of land, with similar provisions as to the remainder in each case — that is, that at

the death of the legatee the estate should vest in the surviving children, if any, and, if no issue survived, then to the next of kin of the legatee. To his sister, Deborah Lowe, he bequeathed a mortgage which he then held against her, and also set apart $4,000 to constitute a trust fund to be kept invested in interest-bearing securities, the net income it should yield to be paid to her, and at the death of Deborah Lowe the trust fund was to go to her children, if any survived, and, if not, then to her next of kin. He bequeathed to Edith Bell, his housekeeper, the sum of $1,000, and directed that all wages due her be paid in addition to that legacy. He bequeathed to the trustees of the Free Will Baptist Church at Wixom $1,000, and the residue of his estate he gave to the children of his deceased brother, Stillman R. Morse. He directed that the taxes upon the life estate should be paid by the life tenant, and appointed Judson L. Sibley as his executor.

On the 11th of September, 1901, at his home in Novi, a codicil was prepared by Mr. Patterson, who went to the home of deceased for that purpose. This codicil revoked the provision for a trust fund for the benefit of Deborah Lowe, and in lieu thereof gave her $2,000 absolutely, and the house and lot in South Lyon occupied by her, and the mortgage he held against her. He gave to his housekeeper, Edith Bell, the sum of $2,000 in addition to the $1,000 bequeated by the will, making $3,000 in all. Six days later another codicil was prepared, in which he revoked the legacy to the trustees of the Free Will Baptist Church at Wixom.

This will and codicils were filed for probate. Objections were made to their probate by the contestant on the ground of the mental incompetency of the testator and undue influence. On the trial of the case on appeal in the circuit court before a jury the case was submitted upon two grounds—first as to the mental competency of John W. Morse; and second as to the undue influence of Edith Bell. The court declined to submit the question of undue influence claimed to have been exercised by Judson L.

Sibley. The jury found a verdict sustaining the will, but refusing probate to the two codicils. The case is brought here by the contestant for review.

The record contains 575 pages and 166 assignments of error. Any attempt to state the testimony at length or to review and discuss in detail the questions raised by the assignments would extend this opinion to the limit of a volume. Some attempt has been made to group the assignments, and the questions necessary to be discussed may be treated under a few heads.

When the witness Patterson was on the stand and had stated his acquaintance with deceased, and the circumstances of the execution of the will, he was asked the question whether or not at this time John W. Morse was mentally and physically competent to make and execute this will. This was objected to, the objection was overruled, and this ruling is claimed to be error under the rule laid down in *Page* v. *Beach*, 134 Mich. 51. The form of the question is perhaps open to criticism. Technically it might be construed as calling for the opinion of the witness upon a question of law. But, as was stated in *Page* v. *Beach*, of similar questions under discussion:

"The questions might be understood by the jurors as calling merely for the degree of intelligence as bearing upon the understanding, recollection, and will power. In such case no harm would be likely to follow."

When we take into account the cross-examination in this case and the full instructions of the court as to the degree of intelligence necessary, it is manifest that the jury were not left to infer that Mr. Patterson had been attempting to state the rule of law, but had been attempting to speak of the degree of intelligence and understanding of the testator. We think no prejudicial error was committed in receiving this testimony.

Dr. Chapman was a witness to the two codicils, and he was called as a witness for the purpose of showing the mental capacity of the testator at the time these codicils were executed in 1901. On cross-examination he was

asked in regard to having treated the deceased for urethritis in 1890, some 11 years prior to the time he witnessed the codicils, and 8 years prior to the execution of the will itself. This testimony was excluded on objection. Contestant contended that on the authority of *Fraser* v. *Jennison*, 42 Mich. 206, the son, Rollin, as heir at law, might waive the statute protecting the patient from the discovery of facts learned by the physician while treating him. In *Fraser* v. *Jennison* the legal representatives were those who were permitted to waive the right. Whether the heir can, against the protest of the legal representatives, waive the right, is a question unnecessary to determine in this case, although there is authority supporting the contention that he may. *Thompson* v. *Ish*, 99 Mo. 160. But in any view of the case we think this testimony was too remote to be of any value in determining the mental condition of testator from 8 to 10 years later, and that no error was committed in its exclusion which prejudiced the rights of contestant.

The claim is made that in the course of the trial an appeal was made to religious prejudices in inquiring as to the religious belief of witnesses. It is claimed that the statute (3 Comp. Laws, § 10207) which provides that no person shall be deemed incompetent as a witness in any court, matter, or proceeding on account of his opinions on the subject of religion, nor shall any witness be questioned in relation to his opinions thereon, either before or after he shall be sworn, was infringed. The witness Alvin Newman was asked on cross-examination if he was an Adventist in religious belief. An answer was given before an objection was interposed; but, on an objection being made, the court said he saw no harm in it. On redirect examination he said he was a Seventh Day Adventist. No comment appears to have been made upon the subject, and, while the inquiry might well have been omitted, no prejudice seems to have been created.

One La Grange was a witness for contestant, and gave testimony tending to show that the contestant, Rollin J.

Morse, attended spiritualistic meetings at his house. No objection was made to this testimony. Minnie Adams was sworn for contestant. She testified that she was not a medium, and no objection was made to the testimony. She was asked if she was a spiritualist, and she replied that she was not. After she had answered the question exception was taken to the asking of the question, but it was allowed to stand. The answer certainly could not have prejudiced either her or the contestant's case before the jury. It is also complained that Dr. Gillette stated that Minnie Adams claimed to him to be a spiritualistic medium. This testimony, however, was taken without objection. Rollin J. Morse was asked if he had written a book on spiritualism, and he answered "No." It is diffi-cult to see how this prejudiced the parties in any way. It does not appear but that the statement of the witnesses were accepted as true, or that any argument was made to the jury upon the subject of the religious belief of either.

Error is assigned upon the refusal to permit an inquiry upon the subject of whether Frank Morse was a drinking man. He was asked on the stand if decedent did not complain to him about drinking. He replied that he did not. He was then asked if, in fact, he did not indulge in the use of liquor. This was not accompanied by any proposition to bring home knowledge of the fact to John W. Morse, nor was it confined to the period of John W. Morse's life. It is now urged that, if to the knowledge of John W. Morse, Frank Morse was a drinking man, it would be less likely that he would have left him a legacy, but the purpose was not made clear to the court, and as it related to the present time, long after John W. Morse's death, its relevancy would not be apparent.

It is strenuously insisted that the court erred in holding and instructing the jury that there was no evidence that undue influence was exerted over deceased by Judson L. Sibley. It is said that the evidence shows that deceased counseled with Mr. Sibley about his business matters; that he had talked with him about adopting Edith Bell;

that Sibley had heard Rollin accuse his father of illegitimate relations with Edith Bell; that he admits having repeatedly urged deceased to make a will, and that, knowing that deceased had but one child and that there could be no occasion to make a will unless he wished to disinherit him, the repeated effort to get him to make a will was an effort to get him to disinherit the son; that the fact that Sibley accompanied Morse to Patterson's office on the occasion of the will being made shows that Morse was utterly dependent upon Sibley.

We have examined this record with great care and are thoroughly satisfied that there is nothing but bare suspicion upon which to rest any claim of undue influence by Mr. Sibley. It is true that he was Mr. Morse's confidential adviser. It is also true that, when Mr. Morse stated to him that he intended to make a will, he advised him not to postpone it too long. As a matter of fact, the making of the will was postponed a couple of months. Mr. Sibley's advice, whenever he was spoken to about it, was that it should be made promptly. This is not undue influence. It is not only a friendly, but a wise suggestion. There is not a scintilla of evidence in the case tending to show that a single provision of this will was advised by Mr. Sibley. He himself in no way profited by the terms of the will. It is true the church of which he is an attendant receives a legacy of $1,000. It is also true that at Mr. Morse's request Mr. Sibley took down a memorandum of the terms of this will. But this of itself is not enough to show that there was any influence exerted, particularly when the fact appears that this was not the only occasion upon which Sibley had looked after the business affairs of deceased.

The contestant claimed that John W. Morse was laboring under an insane delusion in that he believed that his son Rollin was attempting to have a guardian placed over him. The contestant asked an instruction as follows:

"There is no evidence in this case that Rollin J. Morse, the contestant, ever took any steps towards having a guardian placed over his father, the testator, John W. Morse. Indeed, the uncontradicted evidence in this case shows the contrary of this, and, if John W. Morse so believed, he had a delusion affecting Rollin J. Morse, and, if it affected the making of this paper offered as a will, the paper is void."

Contestant himself testified that he had a conversation with one or two people at Wixom upon the subject of having a guardian appointed for his father in the winter of 1896; that he approached that investigation with the view of making a petition for the appointment of a guardian; that he talked with one or two whom he supposed to be his friends to ascertain if it was advisable or practicable to have a guardian appointed; that he was advised that, in view of his father's position in society, it would not be advisable. There was testimony that John W. Morse said to one Starkweather that his son was trying or was going to place a guardian over him. John E. Morse testified that Rollin said to him that there was no way except to appoint a guardian, that the property was being scattered, and he, John E. Morse, talked with John W. Morse about it. The point seems to be that an attempt to appoint a guardian could not be made without a petition in the probate court. Manifestly, as John W. Morse understood it, an attempt was being made when Rollin was advising with a neighbor of John W. Morse with a view of collecting testimony for that purpose.

The contestant also requested the court to charge the jury as follows:

"The will offered in this case for probate is as a matter of law against natural justice, and the proponents are called upon to satisfy you that some good reason must have existed for the practical disinheritance of the testator's only child, Rollin J. Morse, or else you may find it to be the product of an unsound mind or undue influence. In determining the question of testator's capacity, the jury are at liberty to consider whether or not the claims

of near relationship have been disregarded or overlooked, and, if they find that such claims have been disregarded or overlooked, they may consider that fact in connection with the other circumstances of the case, and give it such weight as in their sound judgment and discretion they think it entitled to."

The court did charge the jury upon this subject as follows:

"The fact that a father disinherits an only child for no good cause raises a presumption that he is in fact incompetent. But I add to that, gentlemen, this: That the son in this case is not entirely disinherited by this will and codicils, and I think that I ought to add this that a testator may dispose of his property as he pleases, and that it does not necessarily follow that there is mental incompetency because he distributed it among certain of his blood relatives, and entirely omits one or more of them.
\* \* \*

"The jury may consider the nature and character of the will, and if it be contrary to natural justice, with the other facts of the case, may be considered by the jury in the determination of the question whether or not the testator was of sound mind or had been unduly influenced at the time of its execution. The natural object of John W. Morse's bounty was his son, Rollin J. Morse, because he was his son. With no will, the law would give the estate to the son by inheritance.

"A man owes certain duties to his family, to those he has been instrumental in bringing into the world. He is under certain legal and moral obligations to them, and, if these obligations are overlooked or disregarded, then it is important for you to inquire whether the reasons that are assigned for overlooking and disregarding these duties are such as actually operate upon him, if his mind was sound in so doing; and, if you believe from the facts proven in this case that John W. Morse did not consider or weigh his obligations to his son or was blinded by passion or hatred toward him, then it is your duty to disallow this will."

These instructions were certainly as favorable to contestant as the law would permit. *Spencer* v. *Terry's Estate*, 133 Mich. 39.

Contestant's counsel presented 84 requests, and error is

assigned on the refusal to give certain of these requests. We can only say that, so far as the requests presented were correct statements of legal principles, they were sufficiently covered by the charge. The case was given to the jury in a careful charge which fully presented the issues. No prejudicial error is discovered.

The judgment is affirmed.

CARPENTER, C. J., and MCALVAY, GRANT, and OSTRANDER, JJ., concurred.