# STATE OF MICHIGAN

# COURT OF APPEALS

ABDUL NAHSHAL,

Plaintiff-Appellee,

v

FREMONT INSURANCE COMPANY,

Defendant-Appellant.

FOR PUBLICATION
June 21, 2018
9:05 a.m.

Nos. 336234; 336919
Wayne Circuit Court
LC No.  14-013492-NF

Before:  SWARTZLE, P.J., and SHAPIRO and BOONSTRA, JJ.

SWARTZLE, P.J.

There was a time under the common law when a witness had to swear belief in a Supreme Being before testifying in court.  This time passed, and the common-law rule was set aside.  Today, a witness cannot be questioned about beliefs or opinions on religion, and especial care must be taken that these beliefs or opinions not be used to impair or enhance a witness's credibility.

During the jury trial in this case, plaintiff's wife was asked about her and her husband's religious opinions for the purpose of bolstering her credibility, and this was error.  Whether this error requires automatic reversal or, instead, this error requires a showing of prejudice before relief can be had is the question we address here.  Concluding that, in a civil action, a party must show prejudice from the improper admission of religious belief or opinion testimony before reversal can be had, yet finding defendant has not shown such prejudice here, and finding no other reversible error, we affirm.

## I.  BACKGROUND

In Docket No. 336234, defendant Fremont Insurance Company appeals as of right a judgment awarding plaintiff Abdul Nahshal $130,256.24 for no-fault personal injury protection (PIP) benefits.  In Docket No. 336919, defendant appeals as of right the trial court's subsequent order awarding plaintiff taxable costs, attorney fees, penalty interest, and judgment interest.

Plaintiff was involved in a roll-over automobile accident from which he sustained injuries to his chest, shoulder, back, and neck.  Following the accident, plaintiff also suffered from post-traumatic stress disorder.  Before the accident, plaintiff worked as a server at both the Detroit Athletic Club and Greektown Casino, where he received compensation in the form of wages and

-1-

tips. Plaintiff returned to work at Greektown Casino approximately five weeks after the accident, but he had to change roles from server to cashier because of his injuries. Plaintiff never returned to work at the Detroit Athletic Club.

Plaintiff sought work-loss and related benefits from defendant, his no-fault insurer, including nearly $5,000 per month for lost income and additional amounts for attendant-care and replacement-services benefits. Plaintiff's wife testified at trial that, for several weeks after the accident, it was difficult for plaintiff to do anything because of his injuries. According to plaintiff's wife, she had to help plaintiff to the bathroom for approximately two weeks after the accident. She submitted paperwork to defendant, documenting the assistance she provided to plaintiff. As relevant to this appeal, Attendant Care Service Compensation Claim Forms for October and November 2013 record that plaintiff's wife provided toileting assistance for 17 days. Plaintiff's primary-care physician corroborated plaintiff's wife's testimony that plaintiff was disabled from household duties and needed personal-attendant care.

Defendant's claims specialist testified at trial that she determined plaintiff's work-loss benefit to be $2,500 per month based on the calculation of a certified public accountant (CPA). The difference between defendant's payment and plaintiff's requested amount appears to be based on a disagreement on how plaintiff's tip income should have been calculated. The purported CPA's calculation is not in the record. As of trial, defendant had paid plaintiff a total of $40,000 in work-loss and replacement-services benefits.

Several attempts were made to settle the matter before trial, and the case-evaluation panel recommended a settlement in plaintiff's favor. Defendant rejected the recommendation, and the dispute proceeded to trial. At trial, defendant argued that plaintiff made false statements to defendant to bolster his claim and that dismissal was warranted based upon a fraud-exclusion provision in defendant's policy. The provision at issue is entitled "Concealment or Fraud" and provides:

> **We** will not cover any person seeking coverage under this policy who has intentionally concealed or misrepresented any material fact, made fraudulent statements, or engaged in fraudulent conduct with respect to the procurement of this policy or to any accident or loss for which coverage is sought.

Defense counsel brought up the subject of fraud with plaintiff's wife, questioning whether plaintiff's wife's recordkeeping was honest. On redirect, plaintiff's wife testified as follows:

> *Q.* Okay. Now Ms. Nahshal, are you a religious person?
>
> *A.* Yes.
>
> *[Defense Counsel]*: Your Honor, objection to religion and it's beyond the scope of my cross.
>
> *[Plaintiff's Counsel]*: And he's attacking her honesty, Your Honor.
>
> *[The Trial Court]*: The Court will take the answer.

*Q.* And have you been a religious person all your life?

*A.* Yes.

*Q.* Okay. And your husband, he, you married him the year he came to the United States?

*A.* Correct.

*Q.* Almost 31 years ago?

*A.* Um-hmm.

*Q.* And was he a religious person?

*A.* He was, he was a little, but when I married him he got to be better, more.

*Q.* Okay. And how did that change after this collision?

*A.* He used to go, when he used to come home from work he used to stop at the local mosque and pray whatever pray he's already, 'cause we pray five times a day.

So if one prayer already finished he'll go and pray and come home, so.

*Q.* And—

*A.* And I see him, I see him, he used to pray, but now I don't see him pray. I don't, we pray five times a day like I said, I don't see him pray.

*Q.* Is honesty important to you?

*A.* It's very, very. Everybody knows me knows I'm honest.

*Q.* And have you been honest today and—

*A.* Yes, I have.

*Q.* —in the past?

Almost three years of recordkeeping for—

*A.* Yes, I have.

*Q.* —for the insurance company?

*A.* Yes.

Defendant also brought up the subject of fraud during its cross-examination of plaintiff, specifically with respect to attendant care. Plaintiff testified on cross-examination as follows:

*Q.* Okay. All right. [Your wife] also said that she, you needed assistance going to the bathroom; correct?

*A.* For the first two or three weeks, yes.

*Q.* Okay. She submitted it for one year, did you need it for one year or you only need it for a couple of weeks?

*A.* For the shower, Yes.

*Q.* Okay, I asked –

*A.* For the bathroom, no.

*Q.* Okay. For a year you could not take a shower, is that what you're saying?

*A.* I can, but I cannot clean my back.

*Q.* What about going to the bathroom, could you get up and go to the bathroom?

*A.* Absolutely.

*Q.* Absolutely?

*A.* Yes, sir.

*Q.* Okay. Well then let me, and you could always do that; correct?

*A.* I can go to the bathroom.

*Q.* Excuse me?

*A.* I can go to the bathroom.

*Q.* Okay. All right. I want to show you documents that we've marked as Exhibit Q. And do you know what your wife's signature looks like?

*A.* Of course.

*Q.* Okay. Is that your wife's signature?

*A.* Yes.

*Q.* Okay. So if your wife submitted benefits and she's asking for $80,000 from Fremont Insurance because she says you can't go to the bathroom without her, was that untrue?

*A.* Yeah, that should be untrue.

*Q.* Okay, so that's untrue.

So what your wife submitted to Fremont Insurance Company was untrue; is that correct?

*A.* I'm saying about that, about bathroom. . . .

\* \* \*

*Q.* Okay. The specific question is if your wife submitted claims that she had to take you to the bathroom everyday 'cause you were too physically injured, that's not true is it?

*A.* To the bathroom, using the bathroom, no.

*Q.* Okay. So what your wife submitted to Fremont Insurance Company was not true, correct?

*A.* In everything on that matter.

*Q.* Okay. But just about the bathroom is untrue?

*A.* Yes, about the bathroom.

Defense counsel was not able, however, to point to anything in the trial record showing that plaintiff's wife actually sought reimbursement for $80,000 related to helping her husband with his toiletry needs for a year. Nor could defense counsel identify a record to this effect during oral argument on appeal.

At the close of plaintiff's case-in-chief, defendant moved for a directed verdict, arguing that plaintiff admitted that his wife engaged in fraud, thereby voiding the policy. The trial court denied the motion, but allowed an instruction regarding fraud to be presented to the jury. In closing argument, plaintiff's counsel asked the jury to award $129,634.86 in work-loss benefits, $23,550 in attendant-care benefits, and $19,380 in replacement-services benefits. The jury found defendant liable and awarded plaintiff $129,044.24 in work-loss benefits, $312 in attendant-care benefits, and $900 in replacement-services benefits.

Defendant moved for judgment notwithstanding the verdict, again arguing that the record showed that the policy was voided by fraud and citing plaintiff's testimony regarding toileting. The trial court denied the motion, noting that the question of fraud was presented to, and rejected by, the jury. The trial court entered a judgment that was stayed pending appeal.

Plaintiff then moved for attorney fees, costs, and interest, arguing that defendant's unreasonable failure to pay work-loss benefits entitled plaintiff to payment of those fees under the No-Fault Act. At the hearing on plaintiff's motion, the trial court noted that defendant had essentially agreed to the award of attorney fees from the time of case evaluation and that, therefore, "the issue is is [sic] attorney fees from . . . the beginning." After the parties had made their arguments, the trial court noted that it had "lived this case for the last couple of years." The trial court stated that a verdict was rendered in plaintiff's favor "but there's a little bit more to the story in that regard." The trial court then reasoned as follows:

[T]his was an a accident where the car was upside down. The gentleman was extricated, he was taken to the emergency room.

There was a long litany of things that happened to him in terms of medical and his employment.

Its significant to know, I think it's, the Court think it's significant, this wasn't some brand new adjuster just out of adjuster school, if you will, this person had 21 years of experience as I'm reminded this morning. Knows the ropes if you will.

But this is a Plaintiff that was sent to three IMEs [independent medical evaluations].

The first two IMEs essentially agreed with Plaintiff that Plaintiff needed to see certain medical providers and had significant work restrictions.

If that weren't enough to get this matter moving from the adjuster's perspective then there was a third IME that wasn't given, it came out at trial wasn't given complete medical records.

Case eval was accepted by the Plaintiff.

This Court attempted to settle this matter I think on a number of occasions.

This case was facilitated and at the end of the day it went to trial, Plaintiff was successful.

Plaintiff request[ed] that the Defendant['[s failure to pay the wage loss, no fault benefits was unreasonable. At this point with the benefit of hindsight, if you will, and sitting through the trial and all of the evidence the Court can make that conclusion.

Certainly taxable costs are awardable, which I believe are in excess of $9,000.

The attorney fees Plaintiff accepted case eval, Plaintiffs bettered their position greater than 10 percent. I don't think that Defendant has argued that and

in essence has conceded the attorney fees from the date of the case eval, accept reject.

The issue is is [sic] are we going back to the beginning in terms of the unreasonableness, and from what the Court has now seen the Court would concur.

And then there's the issue of no fault penalty interest which is in light of the above the Court is awarding pursuant to MCL 500.3142(3), and Judgment interest as well pursuant to 600.6013(6).

\* \* \*

The big picture is is [sic] that I'm granting it certainly from a case evaluation standpoint, as well as from the date of beginning.

These appeals followed.

## II. ANALYSIS

### A. USING RELIGION TO ENHANCE WITNESS CREDIBILITY

We begin our analysis with defendant's claim that it is entitled to a new trial based on the trial court's erroneous admission of testimony regarding the religious beliefs or opinions of plaintiff and his wife, in violation of MCL 600.1436 and MRE 610. We conclude that the trial court erred in admitting the plaintiff's wife's testimony on the subject, but the error did not affect defendant's substantial rights under MRE 103 and, therefore, the error is not grounds for a new trial.

### 1. TESTIMONY ABOUT RELIGIOUS BELIEFS OR OPINIONS

In old time, the common law required that a witness swear to belief in a Supreme Being before testifying, the rationale being that only a believer who risked divine punishment would feel compelled to testify truthfully. See 28 Wright & Gold, Federal Practice and Procedure: Evidence, § 6152, p 308; *People v Bouchee*, 400 Mich 253, 264 n 6; 253 NW2d 626 (1977). Unfortunately, this legal rule suffered from being both over-inclusive (if the witness was a liar, then wouldn't he lie about being a believer too?) and under-inclusive (were all atheists really all liars all the time?). The rule also suffered from a version of the liar's paradox—consider the statement, "My testimony is false" (if said by a nonbeliever, then that witness would only testify falsely, but then the statement is actually true; if said by a believer, then that witness would only testify truthfully, but then the statement is actually false—in other words, if false, then true; if true, then false). If this was not bad enough, the rule could result in testimony highly prejudicial to a party when a juror was biased for or against a particular religious belief or opinion. A legal rule that is over-inclusive, under-inclusive, paradoxical, and prejudicial has little to offer and much to avoid.

Michigan long ago cast away this common-law rule. Our Constitution of 1963 states, "No person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief." Const 1963, art 1, § 18. Moreover, since 1842, it has been the statutory law

of the land that a witness cannot be questioned about a person's opinions on religion. See 1842 PA 18; see also MCL 600.1436 (current version) ("No witness may be questioned in relation to his opinions on religion, either before or after he is sworn."). Our rules of evidence likewise reflect this principle: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." MRE 610. While evidence of religious matters may be relevant in certain narrow contexts, see, e.g., *People v Jones*, 82 Mich App 510, 515; 267 NW2d 433 (1978) (noting that testimony about church attendance was permissible when church membership was a fact at issue), if testimony about religious beliefs or opinions is offered to impair or enhance credibility, then that testimony must be excluded.

## 2. THE ISSUE IS PRESERVED

Initially, plaintiff argues that this issue is unpreserved. To preserve an evidentiary error for appeal, a party must object at trial on the same ground that it presents on appeal. *Klapp v United Ins Group Agency*, 259 Mich App 467, 475; 674 NW2d 736 (2003). Counsel must state "the specific ground of objection, if the specific ground was not apparent from the record." MRE 103(a)(1).

When plaintiff's counsel asked plaintiff's wife whether she was "a religious person," defense counsel immediately objected. While defense counsel did not specify a statute or rule of evidence, counsel noted that the objection was based on "religion," to which plaintiff's counsel responded that plaintiff's wife's "honesty" had been "attack[ed]." Based on the specific objection and response as well as the context in which these were given, it is apparent from the record that defense counsel's objection was to the admission of testimony about the witness's religious beliefs or opinion for the purpose of her credibility. Accordingly, this issue is preserved.

When an evidentiary issue is preserved, a "trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo." *Albro v Drayer*, 303 Mich App 758, 760; 846 NW2d 70 (2014). "An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes, but a court also necessarily abuses its discretion by admitting evidence that is inadmissible as a matter of law." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016).

## 3. TESTIMONY ON RELIGIOUS BELIEFS OR OPINIONS

Turning to the merits, we consider first whether the testimony actually concerned a person's religious beliefs or opinions. Plaintiff's wife was asked about whether she and plaintiff were "religious person[s]," how long and to what extent they were religious persons, and, during this colloquy, whether honesty was "important" to her, to which she responded, "It's very, very. Everybody knows me knows I'm honest." Whether someone is a "religious person" can, somewhat vexingly, be understood in different ways. On the one hand, being a religious person might mean, as one example, that the person regularly attends a church or mosque. Being a religious person might also mean, as another example, that the person self-identifies with a specific religious sect, such as Catholicism or Reform Judaism. None of these meanings would

necessarily implicate the person's actual beliefs or opinions about religion. On the other hand, being a religious person might mean, and might be understood by others to mean, that the person ascribes to certain religious beliefs or opinions.

To determine how the phrase was intended to be understood by the jury, we again look to the context in which it was presented. Counsel asked plaintiff's wife about whether she was a religious person to bolster her credibility as a witness. Counsel admitted as much during the colloquy when, in response to the objection, counsel responded, "And [defense counsel] is attacking her honesty, Your Honor." There is little in reason or experience to the suggestion that a "religious person" is honest simply because she attends religious services or identifies with a particular sect. Stated differently, it does not follow that because a person regularly attends a religious service or belongs to a particular sect, therefore, based on the bare fact of that attendance or membership, the person must be honest. There is, however, much more to the suggestion that a "religious person" is honest precisely because that person believes in a Supreme Being who will deliver divine punishment for dishonesty—and it is precisely this type of suggestion that the law no longer permits during judicial proceedings.

It is evident from the colloquy that counsel asked plaintiff's wife whether she was a "religious person" to bolster her credibility before the jury. The inference intended to be drawn by jurors was that plaintiff's wife was a pious believer and that, because of this, honesty was "very, very" important to her. Similar statements have been held to be improper under the law. See, e.g., *People v Blair*, 82 Mich App 719, 719-720; 267 NW2d 164 (1978) (finding that questions on whether the criminal defendant was a "religious man" violated the statute); *People v Killingsworth*, 80 Mich App 45, 54; 263 NW2d 278 (1977) (concluding that asking a defendant about whether she attended church was sufficient to violate the law); but see *People v Calloway*, 180 Mich App 295, 297-298; 446 NW2d 870 (1989) (questioning a witness about whether she was a "religious person" was not sufficient alone to violate the statute when the question had nothing to do with the witness's credibility and the question was relevant to the witness's activities at the time of the murder). Given the context, we conclude that the colloquy fell within the statutory and evidentiary prohibitions and, as a result, the trial court abused its discretion by admitting the improper testimony.

## 4. AUTOMATIC REVERSAL OR REVIEW FOR PREJUDICE?

Defendant argues that our analysis should now be at an end—when religious belief or opinion testimony is admitted for purposes of impairing or enhancing a witness's credibility, reversal is automatic. In support, defendant relies on our Supreme Court's decision in *People v Hall*, 391 Mich 175; 215 NW2d 166 (1974), and its progeny. Were we to apply the remedy in *Hall*, reversal would be automatic. And yet, automatic reversal is generally "disfavored" and is "inconsistent" with our courts' "modern harmless-error jurisprudence." *People v Graves*, 458 Mich 476, 481-482; 581 NW2d 229 (1998); see also MRE 103(a) (providing that an evidentiary error is harmless unless it affects a party's "substantial right").

*Hall* was a criminal appeal from an uttering-and-publishing conviction. The defendant had testified on his own behalf, and on cross-examination, the prosecutor inquired whether the defendant "believe[d] in the Supreme Being?" *Hall*, 391 Mich at 180. Defense counsel did not object, and the defendant replied, " 'Yes, I do.' " *Id*. Immediately following, the prosecutor

asked the defendant whether he "would not tell a falsehood to save [him]self," making clear why the prosecutor had asked the previous question. *Id.* The Supreme Court concluded that this line of questioning violated MCL 600.1436. *Id.* at 181. As to the remedy, the Supreme Court rejected a "case by case" review for prejudice, explaining that this "would emasculate our statute and the legislative intent behind it." *Id.* at 182. Instead, it opted for a rule of automatic reversal, declaring: "A defendant is entitled to a trial free of such improper questions. Once the question is asked, this is no longer possible. A new trial is mandated." *Id.* at 182-183.

Subsequent decisions have extended this rule of automatic reversal to instances when a witness is asked about a criminal defendant's religious beliefs or opinions, *Bouchee*, 400 Mich at 264, and when a criminal victim is asked about the victim's own religious beliefs or opinions, *People v Wells*, 82 Mich App 543, 545-546; 267 NW2d 448 (1978). Other decisions have narrowed the rule, finding it inapplicable when the trial court takes "swift and commendable action" to cut off the improper questioning, *People v Burton*, 401 Mich 415, 418; 258 NW2d 58 (1977), or when a third-party witness is questioned about that witness's own religious beliefs or opinions, not a criminal defendant's, *People v McLaughlin*, 258 Mich App 635, 663-664; 672 NW2d 860 (2003).

In support of defendant's claim for automatic reversal in this case, neither the statute nor the rule of evidence applies solely to criminal actions; rather, by their plain terms, both apply to civil as well as criminal matters. Moreover, it is at least arguable that the religious beliefs or opinions of a party, not just a witness, were explored during the trial here, given the wife's brief testimony about plaintiff's own religious practices. Nor did the trial court take "swift" action to cut off the line of questioning. Yet, unfortunately for defendant, this is the end of any support for its position.

First, to restate, automatic reversal is generally "disfavored." *Graves*, 458 Mich at 481. The rule is used sparingly, almost always in the context of a structural error of constitutional dimension, see, e.g., *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999) (identifying "a very limited class" of constitutional errors that are deemed "structural" and "thus subject to automatic reversal" (internal citation and quotation marks omitted)), and similarly almost always in the context of a criminal action, see, e.g., *id.* at 8-9 (explaining that "these errors deprive defendants of basic protections without which a *criminal* trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no *criminal* punishment may be regarded as fundamentally fair" (emphasis added, internal citation and quotation marks omitted)); but see *Pellegrino v Ampco Sys Parking*, 486 Mich 330, 351 n 14; 785 NW2d 45 (2010) (noting "that *Batson* errors are, in fact, 'structural' and require 'automatic' reversal" and applying the rule in a civil action). It is true that *Hall*'s automatic-reversal rule is one of the rare instances when such a rule is applied in a nonconstitutional context. See *Hall*, 391 Mich at 181-183 (quoting the constitutional provision regarding a witness's competency based on "his opinions on matters of religious belief" but concluding that it was violation of the *statute* that justified automatic reversal). With that said, *Hall*'s automatic-reversal rule has been

the law since 1974, and since then, courts have only applied it in criminal actions, not civil ones. This narrow application and the reasonable inference to be drawn should not be ignored.[1]

Second, supporting a narrow application, there is early case law suggesting that the rule of automatic reversal should not apply in civil actions when testimony about religious beliefs or opinions is offered. In *Sibley v Morse*, 146 Mich 463; 109 NW 858 (1906), the Supreme Court considered a previous version of the statute, 1897 CL 10207. Similar to MCL 600.1436, 1897 CL 10207 provided that "no person shall be deemed incompetent as a witness in any court, matter, or proceeding on account of his opinions on the subject of religion, nor shall any witness be questioned in relation to his opinions thereon, either before or after he shall be sworn." *Sibley*, 146 Mich at 469. *Sibley* involved a civil lawsuit in which several witnesses were questioned about their own religious beliefs or the religious beliefs of other witnesses. *Id*. at 469-470. Counsel objected to some of the questions, but the trial court overruled and allowed the testimony. *Id*. On appeal, the Supreme Court declined to reverse the jury verdict, despite the violation of 1897 CL 10207. The Supreme Court explained that, even for those inquiries that objections were made, the inquiries did not create any prejudice. *Id.*

Neither the *Hall* Court nor any subsequent decision of the Supreme Court has expressly overruled *Sibley* or otherwise suggested that the decision is no longer good law. This Court is "bound to follow decisions by [the Supreme Court] except where those decisions have *clearly* been overruled or superseded." *Associated Builders & Contractors v City of Lansing*, 499 Mich 177, 191; 880 NW2d 765 (2016). Although it is not clear whether the issue here—automatic reversal versus prejudice review—was squarely presented in *Sibley*, it is consequential that the Supreme Court reviewed the improper testimony for prejudice before deciding whether to reverse.

Third and finally, limiting *Hall*'s automatic-reversal rule to the criminal context makes sense. As explained in *Graves*, there are good reasons that automatic reversal is disfavored for the mine-run of cases. It is inefficient, requiring additional proceedings in the trial court, which a prejudice analysis might otherwise show is not necessary. Moreover, the "passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible." *Graves*, 458 Mich at 481 n 4 (internal citation and notation omitted). These and other "social costs" are effectively minimized by application of traditional harmless-error and plain-error standards of appellate review. Other jurisdictions have arrived at a similar conclusion. See, e.g., *Medes v Geico Corp*, 97 Conn App 630, 633-634 and n 2; 905 A2d 1249 (2006) (reviewing for prejudice the improper testimony of a person's religious beliefs or opinions); *Steele v Inn of Vicksburg, Inc*, 697 So 2d 373, 377-378 (Miss App, 1997) (same); *Kolaric v Kaufman*, 261 Cal App 2d 20, 27-28; 67 Cal Rptr 729 (1968) (same).

---

[1] In distinguishing criminal actions from civil ones, we admittedly paint with a broad brush. We recognize that there are a limited set of civil actions that have criminal-like aspects, such as parental-termination actions. The present action does not fall within that limited set, and, accordingly, we take no position on whether actions in that set should be subject to *Hall*'s automatic-reversal rule for violation of MCL 600.1436 or MRE 610.

Therefore, because *Hall*'s automatic-reversal rule has been applied only in the criminal context, and there is support in precedent and logic to reject the rule in the civil context, we will eschew *Hall*'s rule and review the improper religious belief or opinion testimony for prejudice.

### 5. THE ERROR DOES NOT REQUIRE REVERSAL

Because the issue was preserved, we review the admission of the improper testimony to determine whether such admission was harmless error or reversible error under MRE 103(a). A trial court error is harmless if, based on review of the entire record, it is more probable than not that the error was not outcome determinative; if the probability runs in the other direction, then it is reversible error. *Barnett v Hidalgo*, 478 Mich 151, 172; 732 NW2d 472 (2007); see also MCR 2.613(A); *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 157-158; 908 NW2d 319 (2017).

Our review of the record confirms that it was more probable than not that the admission of the improper testimony was not outcome determinative. Plaintiff's wife's credibility was attacked with respect to the extent of attendant care claimed by plaintiff. Yet, several witnesses, including plaintiff and his treating physician, testified about plaintiff's need for services after the accident. Moreover, the improper testimony was offered in response to defendant's assertion that plaintiff's wife had submitted false reports to defendant—specifically, that plaintiff's wife had claimed that she was entitled to $80,000 for her assistance in helping plaintiff to the bathroom for a year. Yet, defendant provided no documentary evidence to back up this assertion in the first place. The relevant documentation submitted to defendant did not mention an $80,000 claim—the documentation instead showed that plaintiff's wife claimed that she helped defendant with toileting for 17 days, consistent with her trial testimony that she helped plaintiff to the bathroom for a couple of weeks. Finally, despite finding that plaintiff was entitled to attendant-care and replacement-services benefits, the jury only awarded plaintiff $312 and $900, respectively, for those services, which was substantially less than the requested amount. Thus, the jury's verdict indicates that it was not swayed by the improper inquiry into religious beliefs or opinions. Accordingly, although the trial court erred by admitting the improper testimony, the error was harmless and reversal is not required.

### B. DIRECTED VERDICT OR JNOV

Defendant next argues that the trial court erred by denying its motions for directed verdict or JNOV. Defendant argues that documentation submitted in support of plaintiff's claim was demonstrably false, thereby triggering the fraud exclusion contained in the insurance policy. We review "de novo a trial court's decision with regard to both a motion for a directed verdict and a motion for JNOV." *Taylor v Kent Radiology*, 286 Mich App 490, 499; 780 NW2d 900 (2009). Both motions are "essentially challenges to the sufficiency of the evidence in support of a jury verdict in a civil case." *Id*. at 499. A directed verdict or JNOV is only appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Id*. at 499-500. "If reasonable persons, after reviewing the evidence in the light most favorable to the nonmoving party, could honestly reach different conclusions about whether the nonmoving party established his or her claim, then the question is for the jury." *Id*. at 500.

In *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 423-425; 864 NW2d 609 (2014), this Court held that to void a policy under a fraud exclusion based on a willful misrepresentation of a material fact, the insurer must prove: (1) the representation was false; (2) the representation was material; (3) the insured made the representation (a) knowing that it was false or (b) recklessly, without any knowledge of its truth; and (4) the insured made the representation with the intention that the insurer act upon it. When there is a question of fact on at least one of the elements, and the insured is not otherwise entitled to summary disposition, the matter is one for the jury. *Shelton v Auto-Owners Ins Co*, 318 Mich App 648, 656; 899 NW2d 744 (2017).

Defendant argues that plaintiff admitted that his wife submitted a false claim for $80,000 based on a false report that she helped plaintiff in going to the bathroom every day for a year. Yet, as noted earlier, nowhere in the records provided to the trial court does plaintiff's wife seek $80,000 for assistance with plaintiff's toileting for a year; rather, the documentation she sent to defendant indicates that she helped plaintiff with toileting for 17 days following plaintiff's accident. This documentation is consistent with her testimony that she helped plaintiff to the bathroom for a couple weeks following plaintiff's accident. It is unclear where in the record defendant's trial counsel came up with the purported $80,000 for one year of toileting assistance, and defendant has similarly failed to clarify the matter on appeal. Defendant bore the burden of proving an intentional misrepresentation sufficient to invoke its policy exclusion. Because defendant has not proven the factual predicate supporting its argument, defendant was not entitled to a directed verdict or JNOV.

## C. ATTORNEY FEES

Finally, defendant argues that the trial court applied the wrong legal standard and committed plain factual error in awarding attorney fees to plaintiff. "The no-fault act provides for attorney fees when an insurance carrier unreasonably withholds benefits." *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008); see also MCL 500.3142. A judgment that an insurer owes PIP benefits that have not already been paid to the insured creates a rebuttable presumption that the refusal or delay in paying benefits was unreasonable. *Attard v Citizens Ins Co of Am*, 237 Mich App 311, 317; 602 NW2d 633 (1999). Thus, the insurer bears the burden of showing that the withholding was "based on a legitimate question of statutory construction, constitutional law, or factual uncertainty." *Id*. "The trial court's finding of unreasonable refusal or delay will not be reversed unless it is clearly erroneous." *McKelvie v Auto Club Ins Ass'n*, 203 Mich App 331, 335; 512 NW2d 74 (1994).

After the trial, plaintiff moved for attorney fees based on defendant's refusal to pay the full amount of work-loss benefits owed. In ruling on plaintiff's motion, the trial court stated that its conclusion was based on the "benefit of hindsight" and the evidence presented at trial. Yet, the relevant inquiry "is not whether the insurer ultimately is held responsible for a given expense, but whether the initial refusal to pay the expense was unreasonable." *McCarthy v Auto Club Ins Ass'n*, 208 Mich App 97, 105; 527 NW2d 524 (1994). The trial court's reference to the "benefit of hindsight" suggests that it may have made its decision on attorney fees based on the jury's ultimate finding of liability, though admittedly the phrase and context are ambiguous on this point.

We need not resolve the ambiguity here because any error was harmless. The record makes clear that defendant failed to overcome the statutory presumption that it was unreasonable not to pay the full amount of work-loss benefits owed. Defendant's claims specialist testified that she based her decision to authorize a lower reimbursement on certain CPA calculations, but defendant failed to produce any evidence corroborating this assertion. By failing to produce any records, there was no basis for the trial court, or this Court on appeal, to determine whether defendant's reliance on the purported CPA calculations was reasonable. Thus, the trial court was warranted in awarding attorney fees to plaintiff, regardless of whether it stated the proper standard during the hearing.

## III. CONCLUSION

The law no longer requires or even permits the questioning of a witness about religious beliefs or opinions, especially when such questioning is intended to impair or enhance a witness's credibility. The trial court erred by permitting plaintiff's counsel to question plaintiff's wife about her and her husband's religious beliefs and opinions. As to the remedy, while there is a time to follow *Hall*'s automatic-reversal rule for such errors, there is a time to follow a different path. As explained *supra*, we conclude that the automatic-reversal rule does not apply in civil lawsuits and any improper religious belief or opinion testimony should be reviewed for prejudice on appeal.

Because the issue was preserved, we review the improper testimony under this jurisdiction's harmless-error standard. Finding no reversible error, either with the improper testimony or the other claims raised by defendant, we affirm both the judgment and the award of attorney fees. As the prevailing party, plaintiff may tax costs under MCR 7.219.

/s/ Brock A. Swartzle
/s/ Douglas B. Shapiro
/s/ Mark T. Boonstra

-14-