*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WOODBURY/DRAYTON, Minors.

UNPUBLISHED
September 19, 2025
9:30 AM

No. 374139
St. Joseph Circuit Court
Family Division
LC No. 2024-000649-NA

Before: SWARTZLE, P.J., and GARRETT and YATES, JJ.

PER CURIAM.

After an adjudication trial, the trial court founds grounds to take jurisdiction over respondent-mother's two children, KD and AW, under MCL 712A.2(b)(1) and (2). On appeal, respondent-mother[1] challenges the evidence that the trial court admitted and argues that the trial court erred by finding statutory grounds to exercise jurisdiction. We affirm.

## I. BACKGROUND

In September 2024, law enforcement was alerted to respondent-mother livestreaming video on Facebook, in which she was sharing nonsensical, bizarre statements. Officer Matt Kilbourn, of the Three Rivers Police Department (TRPD), watched the video, and officers went to respondent-mother's location. Ultimately, the children were taken into protective custody, officers took respondent-mother to the hospital, and the Department of Health and Human Services (DHHS) filed a petition seeking removal and jurisdiction of the children.

The trial court held an adjudication trial in December 2024. Officer Kilbourn testified that, after watching respondent-mother's video in September 2024, he was concerned about her mental health. When Officer Kilbourn went to respondent-mother's location to speak with her, she was paranoid and made nonsensical statements throughout the entire interaction. Respondent-mother and the children were carrying some belongings. Officer Kilbourn was concerned because the

---

[1] Neither child's father is a party to this appeal.

family appeared to have traveled over eight miles, without explanation. He believed that respondent-mother "was suffering from a mental health crisis." Officer Kilbourn testified that he also did not know when the children had last eaten, although they physically appeared to be okay and were dressed appropriately. According to Officer Kilbourn, the children did not appear to be "necessarily" scared. Officer Kilbourn talked with respondent-mother about taking her into protective custody due to her mental health, and respondent-mother did not understand why that was needed, although she ultimately voluntarily went with the officers.

Officer Kilbourn also testified about viewing other social-media videos that depicted respondent-mother exhibiting the same kind of paranoid behaviors. These videos were not saved; instead, the DHHS provided five different videos to Officer Kilbourn shortly before trial. Petitioner's attorney asked Officer Kilbourn if those five videos were comparable to the videos that he had previously viewed, and Officer Kilbourn stated that respondent-mother's behavior and appearance in the videos were similar. Although Officer Kilbourn did not know the specific dates of the videos, he estimated that, because of the similarities, the videos were made "within the previous days leading up to" his encounter with respondent-mother. Petitioner's attorney asked Officer Kilbourn if the videos would give the trial court "a good idea of exactly how [respondent-mother] sounded" in September 2024, and Officer Kilbourn stated, "Yes."

Petitioner moved to admit the five videos. Respondent-mother's attorney objected, asserting that Officer Kilbourn could not verify when the videos were recorded. Petitioner's attorney stated that he could call respondent-mother to testify about when she recorded the videos. The trial court overruled the objection and allowed the videos to be played and admitted. Petitioner played the videos, asking Officer Kilbourn to identify the person and location depicted in the videos. Officer Kilbourn identified respondent-mother in the videos, and he confirmed that what she was saying in the videos did not make sense to him. Officer Kilbourn confirmed that the videos appeared to be from the same Facebook profile that he had observed on the day of the incident.

Officer Breanna Books, a police social worker for the TRPD, testified that she had responded to the scene in September 2024 and, when she arrived, she saw respondent-mother livestreaming in a parking lot with her belongings near her. Officer Books saw KD and AW, and they "looked not thrilled to be there." Respondent-mother talked about the FBI following her and made other delusional statements, including about "nanobots implanted into her brain." Respondent-mother explained that she had left their apartment because "it had been filled with gas." Someone had checked and informed her that the apartment was fine, but respondent-mother did not trust the person, believing that the responder who checked her home was working with the FBI or other unidentified people following her. Respondent-mother and the children had gone from Constantine, Michigan, to Three Rivers, Michigan, walking some of the way and riding some of the way, "during the night."

Officer Books testified that, in her role, she did not question people, but she spoke with people who wanted to speak with her. When Officer Books sat down next to KD, KD "very quickly and excitedly" told Officer Books what had happened. KD had stated that she was not okay, respondent-mother made them walk from Constantine, and KD had not had anything to eat or drink. KD told Officer Books that she was scared and did not want to go back with respondent-mother. Officer Book further testified that KD told her that there was nothing wrong with their

apartment, but respondent-mother made them leave, and KD did not "want to have to walk here," and they had nowhere to go. KD was worried about AW, and she thought that respondent-mother was brainwashing AW because he did not want to separate from her. KD also reported to Officer Books that respondent-mother had been dealing with mental-health issues for the previous year, including having delusions that people were following her. Officer Books testified that she had not asked KD many questions, and she did not speak much to AW because he was extremely shy. According to Officer Books, the children appeared to be scared.

Officer Books asked respondent-mother when they had last eaten, and respondent-mother answered that "it had been about two days since they had had a real meal." Respondent-mother was not sure when they had last had water, so Officer Books got water for them. The children drank it quickly. Officer Books further testified that respondent-mother's "moods were very unstable throughout this entire interaction." In Officer Books's opinion, the children "were in unseasonably warm clothing and sweating." Respondent-mother was released from the hospital later that day, and Officer Books testified that she had "never been that upset about someone not being kept" by the hospital.

The trial court concluded that there were statutory grounds to exercise jurisdiction under MCL 712A.2(b)(1) and (2). The trial court explained that there was "no question" that respondent-mother was experiencing a "severe mental health crisis" at the time of the incident, with the children "right there in the mix of it." The trial court noted that respondent-mother created the five admitted videos "at or near this time the incident took place." The trial court noted that KD made an "excited utterance" to Officer Books about how scared she was. The trial court explained that the family had walked part of the eight miles away from home, partially at night. The trial court also acknowledged Officer Books's testimony that "she had never been more upset" when the hospital released respondent-mother because of the seriousness of the situation and risk to the children.

Respondent-mother now appeals.

## II. ANALYSIS

## A. THE FIVE VIDEOS

First, respondent-mother argues that the video evidence presented at the adjudication trial was not authenticated. We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *In re Archer*, 277 Mich App 71, 77; 744 NW2d 1 (2007). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes, including "by admitting evidence that is inadmissible as a matter of law." *Nahshal v Fremont Ins Co*, 324 Mich App 696, 710; 922 NW2d 662 (2018) (cleaned up). We review de novo preliminary legal questions involving the admissibility of evidence. *Kuebler v Kuebler*, 346 Mich App 633, 653; 13 NW3d 339 (2023). We also "review de novo the interpretation and application of statutes, court rules, and the rules of evidence." *Id*. The rules of evidence generally apply to adjudicative trials in child-protective proceedings. *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014).

This Court has explained that "challenges to the authenticity of evidence involve two related, but distinct, questions." *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144,

154; 908 NW2d 319 (2017). First, the trial court must determine "whether there is sufficient reason to believe that the evidence is what its proponent claims for purposes of admission into evidence." *Id*. Next, the fact-finder determines "whether the evidence is, in fact, what its proponent claims for purposes of evidentiary weight and reliability." *Id*. at 154, 156. Evidence does not need to "be free from all doubt to be authenticated for purpose of admission." *Id*. at 157.

Under MRE 901(a), to authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is." This Court has held that testimony from a law enforcement officer about familiarity with a person's appearance, social media, affiliations, and pseudonym can authenticate social-media content, even if that content is owned by another user who did not testify to authenticate the content. See *People v Smith*, 336 Mich App 79, 91, 109-110; 969 NW2d 548 (2021). There may be, however, concern "in the age of fake social-media accounts, hacked accounts, and so-called deep fakes" about the authenticity of social-media content. *Id*. at 107.

This situation poses a "close call" about whether the videos were properly authenticated, see *id*. at 109, even if "evidence need not be free from all doubt to be authenticated for purposes of admission," *Mitchell*, 321 Mich App at 157. Officer Kilbourn testified about being familiar with respondent-mother's livestreaming and conduct, but he could not identify when the videos were taken or otherwise confirm their authenticity. Although the attorney for the DHHS offered to call respondent-mother to testify about the dates of the videos, this did not occur. Accordingly, there is minimal evidence about the timing of the videos.

Although respondent-mother did not, and does not, raise a relevance challenge, the DHHS did not argue that the admitted videos were depictions of what occurred on the day that law enforcement removed the children from respondent-mother. Instead, the DHHS admitted the evidence to demonstrate how respondent-mother acted at the time. Even if this was a type of demonstrative exhibit, the admission of the videos raises concerns that the evidence was improper character evidence, admitted to prove that respondent-mother acted in accordance with that character. See MRE 404(a).

Because of the close question about the authenticity of the videos, in addition to the character-evidence issue, we will assume for purposes of this appeal that the trial court should have excluded the videos. The admission of improper evidence is not grounds for automatic reversal. See MCR 2.613(A). Instead, we must consider whether it was more likely than not that a different outcome would have resulted had the evidence been excluded. See *In re Miller*, 347 Mich App 420, 429; 15 NW3d 287 (2023). And, as explained later, respondent-mother has not met this standard.

## B. HEARSAY

Before reaching that issue, however, we consider respondent-mother's argument that Officer Books's testimony contained hearsay statements from KD. Respondent-mother's counsel did not object to these statements, and, accordingly, the issue is not preserved. See *Nahshal*, 324 Mich App at 709-710. "[R]eview of unpreserved issues in termination cases is for plain error affecting substantial rights." *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 2.

"Hearsay" is a statement that "the declarant does not make while testifying at the current trial or hearing" that the "party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). "Hearsay is not admissible unless these rules provide otherwise." MRE 802. One exception to this rule involves an "excited utterance," which is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." MRE 803(2). To constitute an "excited utterance," a statement must "arise out of a startling occasion—startling enough to produce nervous excitement and to render the utterance spontaneous and unreflecting." *In re Meeboer*, 134 Mich App 294, 301; 350 NW2d 868 (1984). Further, the statement "must be made before there has been time to contrive and misrepresent." *Id*. Finally, the statement "must relate to the circumstances of the startling occasion." *Id*.

Here, Officer Books's testimony about KD's statements was hearsay. See MRE 801(c). The record demonstrates, however, that the trial court did not plainly err by admitting KD's statements because they were excited utterances. First, KD was in a startling situation when law enforcement arrived and intervened after respondent-mother had insisted that the family leave their home and travel miles without adequate food and while respondent-mother livestreamed nonsensical statements.

Second, the record supports the inference that KD's statements were made before she had "time to contrive [or] misrepresent," *id*., because she offered the statements without questioning or detailed prompting. Although the overarching experience of leaving her home and traveling for hours was lengthy, the event came to a head when officers arrived and spoke with the family. Third, KD's statements, about respondent-mother's actions and KD's resultant fear, were related to the circumstances of the startling situation. Respondent-mother argues that KD's comments about respondent-mother struggling with delusions and paranoia for a year undermine the notion that the comments were excited utterances. Respondent-mother's year-long battle with paranoia, however, was a circumstance that related to the startling occasion of KD being forced to leave home, travel by foot for hours, and engage with police officers. Accordingly, KD's statements were admissible under MRE 803(2), and the trial court did not plainly err by admitting them.

## C. EVIDENCE WITHOUT THE FIVE VIDEOS

Thus, the only problematic evidence admitted at trial was the five videos, and we now review the record assuming those videos should have been excluded. "Challenges to the court's decision to exercise jurisdiction are reviewed for clear error in light of the court's finding of fact." *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371973); slip op at 3 (cleaned up). Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake, "giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. (cleaned up). We likewise consider whether it is more likely than not that a different outcome would have resulted had the five videos been excluded. See *In re Miller*, 347 Mich App at 429.

At an adjudication trial, "the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *In re Sanders*, 495 Mich at 405. "To determine whether jurisdiction exists, the trial court must examine the child's situation at the time the petition was filed because MCL 712A.2(b) speaks in the present

tense." *In re Leach*, 347 Mich App 26, 32; 14 NW3d 178 (2023) (cleaned up). Under MCL 712A.2(b)(1), a trial court may exercise jurisdiction over a child whose parent:

> when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. [MCL 712A.2(b)(1).]

Further, jurisdiction is proper if a child's "home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in." MCL 812A.2(b)(2). For each jurisdictional basis, "neglect" means:

> harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care. [MCL 722.602(1)(d).]

In this case, even without the five videos, the record clearly demonstrates that respondent-mother was experiencing a mental-health crisis, and she forced KD and AW to leave their home and walk for miles. Respondent-mother exhibited paranoid and delusional behavior. Further, the children had not eaten a meal for some time, and, at least according to Officer Books, the children appeared to be scared. The collective effect of respondent-mother's mental health, the children's deprivation of shelter and food, and the children's emotional states, demonstrates a substantial risk of harm to their well-being. See MCL 712A.2(b)(1).

As to MCL 712A.2(b)(2), respondent-mother argues that there was no evidence that the children's home was unfit. Jurisdiction is proper under this basis, however, if the child's "home *or environment*" is unfit. MCL 712A.2(b)(2) (emphasis added). The record clearly demonstrates that the children's environment was unfit precisely because they had been forced to leave their home because of respondent-mother's delusions. Respondent-mother was depriving the children of a fit living environment. Further, respondent-mother's behavior constituted neglect because she failed to provide adequate food and shelter for the children. See MCL 722.602(1)(d).

Thus, the trial court did not clearly err by exercising jurisdiction under either MCL 712A.2(b)(1) or (2). And it is not "more likely than not" that jurisdiction would have been improper had the five videos been excluded. Accordingly, we find no reversible error with respect to respondent-mother's evidentiary challenges.

## D. WAIVER

Lastly, respondent-mother briefly argues on appeal that she was denied the effective assistance of counsel because trial counsel did not object to Officer Kilbourn's testimony about other videos that he observed in September 2024 and did not object to the hearsay statements. Because respondent-mother did not present this issue in her statement of issues presented, we need

not address it. See *English v Blue Cross Blue Shield of Mich*, 263 Mich App 449, 459; 688 NW2d 523 (2004).

Affirmed.

/s/ Brock A. Swartzle
/s/ Kristina Robinson Garrett
/s/ Christopher P. Yates