*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF ROBERT GERALD BOYK.

KATHLEEN MCFADDEN and CAROL
JANOWSKI,

Appellants,

v

BARBARA BAKER,

Appellee.

UNPUBLISHED
February 27, 2020

No. 345915
Wayne Probate Court
LC No. 2016-823193-DA

Before: SHAPIRO, P.J., and JANSEN and M. J. KELLY, JJ.

PER CURIAM.

This probate dispute between siblings arises out of the July 2016 death of their father, Robert Gerald Boyk. Appellants Kathleen McFadden and Carol Janowski appeal as of right the probate court's opinion and order holding that they had failed to demonstrate that several instruments executed by Boyk before his death—an April 28, 2014 "Lady Bird" deed[1] and several last wills executed in or after 2013—were the result of undue influence exerted by appellee Barbara Baker. Because there are no errors warranting reversal, we affirm.

---

[1] "This type of quitclaim deed is named after President Lyndon Johnson's wife, 'Lady Bird,' because President Johnson was thought to have once used this type of deed to convey some land to her. A Lady Bird deed conveys an enhanced life estate that reserves to the grantor the rights to sell, commit waste, and almost everything else." *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 687 n 2; 880 NW2d 269 (2015) (quotation marks, citations, and brackets omitted).

-1-

# I. BASIC FACTS

After Boyk's wife predeceased him in 2002, he lived alone in their multilevel home in Dearborn Heights. In 2013, however, he asked appellee to live with him. She agreed, moving into the home in August 2013. On appeal, appellants allege that in the years preceding Boyk's death, appellee unduly influenced him to execute the disputed instruments.

All of the witnesses agreed that Boyk was a strong-minded, opinionated, "take-charge," religious man with a keen work ethic. McFadden's daughter, Melissa, had been "very, very close" with Boyk. Although it was a "very close knit family," appellee did not have a good relationship with her other siblings, and she admitted that she wanted no contact with them. According to Melissa, shortly after appellee moved in with Boyk, appellee began "bashing" her siblings by stating that they were "drug dealers," had "picked on" her when she was younger, and had been "partiers" and "gamblers." Boyk was a teetotaler, disapproved of drug use "completely," and only tolerated gambling in moderation. Boyk seemingly began to believe appellee's allegations, and he repeated them. To Melissa's knowledge, "immediately after [appellee] moved in," Boyk stopped calling and independently visiting family members, became "very quiet and secretive," and never went anywhere without appellee. Appellants offered similar testimony concerning changes in Boyk's behavior after appellee moved into his home.

According to appellee, in October 2013, Boyk told her that he wanted to visit a lawyer about some "personal business." She did not question him about specifics, but went with him to visit lawyer Peter Staver. Most of the meeting was private, but at one point, appellee was called into the room to discuss a power-of-attorney designation. Ultimately, Boyk executed documents nominating appellee as his patient advocate and attorney-in-fact with regard to finances. Appellee denied using her financial powers as his attorney-in-fact.

Staver confirmed that he met with Boyk and appellee in October 2013 because Boyk wished to have Staver review his existing estate plan, including a quitclaim deed that Boyk and his wife had previously executed with regard to their Dearborn Heights home. Staver believed that he excused appellee from the room because he needed to meet with Boyk alone. Thereafter, Staver explained to Boyk that the quitclaim deed had vested Janowski with a present property interest, plus rights of survivorship, in the Dearborn Heights property. As a consequence, Staver explained, that before Boyk could "do anything with that house," he would need Janowski's "permission." Boyk seemed "surprised" by this, but not upset. He asked Staver to prepare a deed that would allow Boyk to dispose of the property however he saw fit. Ultimately, Staver prepared and recorded such a deed. Staver also prepared a last will and testament for Boyk, which named Janowski as personal representative of his estate, named appellee and one of Boyk's sons as successor personal representatives, afforded appellee a two-year life estate in the Dearborn Heights property, and otherwise equally divided his estate between his children.

According to Melissa, sometime in February 2014, she visited Boyk's home and discovered that a social worker from Adult Protective Services (APS) was there. Appellee was "extremely angry" and believed it was Janowski who had filed the complaint with APS. According to appellee, the visit from APS came two days after Boyk had a heated telephone conversation with Janowski, which ended when "he told her she needed some psychological help and hung up on her." Boyk was "very upset" about the APS visit, and he was particularly angry

with Janowski.  Appellant McFadden also stated that she was accused of having made the APS complaint.  Thereafter, she did not visit Boyk's home as often because, when she attempted to do so, he and appellee would generally not answer the door.  Around that time—in January 2014—McFadden began to worry that appellee was exercising undue influence over Boyk.  Yet, McFadden also admitted that until "late December" 2015, Boyk seemed largely in control of his faculties and "could do anything."  And appellee testified that throughout 2014 and 2015, Boyk became increasingly "tired of" various family members, and he eventually instructed her to let them know they were no longer welcome in his home.

In March 2014, Boyk sold his home in Dearborn Heights and purchased another multilevel home in Belleville.  Melissa and Janowski found this perplexing, given that Boyk had previously indicated that he wanted to "downsize" and live in a single-story home.  According to Melissa, appellee openly admitted that she had been the one to pick out the Belleville home, not Boyk.  In contrast, appellee testified that Boyk "always wanted a colonial" and had been the one who selected the Belleville property.  Appellee's siblings did not visit "very often" after Boyk moved, visiting "[m]aybe once a month[.]"  Furthermore, there was testimony suggesting that appellee changed Boyk's phone number in order to thwart contact between him and her siblings.

Staver met with Boyk a second time, alone, on March 4, 2014.  Appellee admitted that she drove Boyk to that appointment and waited for him in the lobby.  Staver testified Boyk asked him to prepare a new estate plan.  Boyk stated that he wanted to bequeath his new home in Belleville to appellee "absolutely," that he wished to include a specific bequest of $15,000 to Melissa, and that he wanted to leave the residue of his estate to appellee.  This grabbed Staver's "attention" and struck him as "unusual," because the change had the effect of disinheriting all of Boyk's other heirs.  Accordingly, Staver spent "some length of time" asking Boyk "why he was making a decision like that."  Boyk responded by listing each child, in order, and stating his reasons as to that child.  Boyk "had nothing derogatory or negative to say.  But he had reasons for what he was doing."  Staver could not recall all the stated reasons, but as a general impression, Boyk had seemed to believe that the disinherited children were already financially secure, whereas he believed that appellee was the least financially secure and did not have a home of her own.  Staver testified that Boyk "wanted to be sure she had a place to live."  Staver encouraged Boyk to speak with all of his children about his wishes, suggesting that such a conversation might make it easier for the disinherited siblings to accept his decision, but Boyk declined.  Indeed, after Staver pressed the matter, Boyk "became annoyed with" him, indicating "that these were his assets" and, as such, he "didn't need anybody's permission to do whatever he wanted to do with them."

At the meeting, Staver also took steps to assure himself that Boyk had testamentary capacity and was under no undue influence.  With regard to undue influence, it concerned Staver that Boyk was living with appellee.  But Staver's overall impression, after questioning Boyk, was that he was still seeing his other children, was "outgoing" and "socially active," and was frequently "out of the house."  Overall, Staver thought that Boyk did not appear "to be isolated in any way" or "overly dependent."  Rather, "he was absolutely a strong-willed person," having always been the "bread winner" and a strong paternal figure in his household.  Staver ultimately dismissed his initial concerns regarding undue influence and prepared a will, which Boyk executed on March 31, 2014.  The March 31, 2014 will was more favorable to appellee than the previous will.

Staver testified that Boyk returned to his office on April 16, 2014. Staver was certain that he met with Boyk alone to discuss his wishes. He recalled that Boyk had wanted to make further changes to his will and had requested a Lady Bird deed covering the Belleville property. Staver prepared the requested deed and a revised will, and Boyk executed both on April 28, 2014. In substance, the April 28, 2014 will was largely identical to the prior will. However, although minor, the changes were again favorable to appellee.

According to McFadden, in May 2014, she went to the Belleville home at Boyk's request, along with her children and husband. At one point, McFadden asked appellee if she could carry a few bags of yard waste back to the garage. McFadden testified that appellee waited until she and McFadden were alone, then said, "Do it yourself . . . . I got a gun and I ain't afraid to use it on you." After McFadden's husband heard about that threat, she was no longer "allowed" to go to Boyk's home unescorted. In addition, according to Janowski, in June 2014, she witnessed appellee throw away mail that had been sent to Boyk.

Staver testified that in November 2014, Boyk visited him one last time. They met alone. Boyk asked Staver to prepare a revised will disinheriting Melissa and removing her nomination as successor personal representative. Staver inquired as to Boyk's motivations, and his best "recollection" was that Boyk had "simply changed his mind." Staver prepared a revised will that was consistent with Boyk's request, and Boyk executed it on November 11, 2014.

Subsequently, on September 15, 2015, McFadden and her son, John, went to Boyk's house, planning to visit him because it was his 82nd birthday. Although appellee was home, she refused to answer the door. Nevertheless, seeing Boyk inside, they entered the house. Boyk became "all excited." McFadden testified that Boyk told appellee, "they really do love me." McFadden stated that, standing behind Boyk, appellee gave her a "hateful" look. Later, Boyk invited McFadden into another room to look at some furniture, and appellee said several things about McFadden that made John angry. Eventually, appellee indicated that she had to go perform an errand. McFadden said that she would stay with Boyk while appellee was gone. Suddenly, appellee came "running" into the room and "grabbed" McFadden by the arms. McFadden yelled, "[L]et go, don't you ever put your hands on me." Boyk came into the room and told McFadden "to get the hell out of the house." She agreed to leave, but appellee "kept shoving [her] down the hallway." Ultimately, appellee "threw" McFadden out of the home and "shoved" John out the door. McFadden reported the incident to the police, and appellee was arrested.

Melissa testified that she spent the following two days—during which appellee remained in jail—with Boyk. It was her first "one-on-one time" with him since appellee had moved in with him in 2013. During that time, Boyk indicated that he did not "know where anything" was, including his checkbook and the key to his mailbox. Melissa stated that he "was very upset" with appellee and McFadden alike, stating that "this is ridiculous" and that the family had "to get this in order." At Melissa's suggestion, he agreed that they should hold a videotaped family meeting. Appellee initially agreed, but about eight hours after she was released from jail, she called Melissa and cancelled, stating that Boyk no longer wanted to have the meeting. Appellee also indicated that McFadden and her son were no longer permitted in Boyk's house and that the police would be summoned if they tried to enter.

In January 2016, Janowski filed two petitions seeking to be appointed as Boyk's conservator and full guardian. In a supporting affidavit, Janowski averred that appellee had "effectively banned" all of Boyk's other children. Janowski also indicated that she believed that appellee might have been "exercising undue influence over [Boyk] and his finances."

As a result of the petitions, the probate court ordered that an independent evaluation of Boyk be performed by a geronotologist, Dr. Marlana Geha. Dr. Geha performed that evaluation at Boyk's home on February 9, 2016, noting that appellee was present during the interview "at [Boyk's] request." As part of the evaluation, Dr. Geha also interviewed Boyk's children, his physician, Staver, Janowski's lawyer, and the lawyer who then represented Boyk. Dr. Geha also reviewed the probate court file, the "Estate documents," and Boyk's medical records. In relevant part, Dr. Geha reported to the probate court as follows:

> This Gerontologist found no particular problems with Mr. Boyk's living arrangement. Mr. Boyk reported that he and his daughter are both on the property deed and that they share expenses . . .
>
> Robert Boyk presented as a well-developed, adequately-nourished, eighty-two year old, Caucasian male. Mr. Boyk was adequately dressed and groomed in clean, casual street clothes. Mr. Boyk reported that he was independent with respect to all of his personal activities of daily living . . . . Throughout the interview, Mr. Boyk presented speech that was clear, cogent, and topic oriented. It should be noted that Mr. Boyk reported that he was angry that he was being interviewed secondary to a Court order. He was very angry regarding the fact that the Petitions had been filed.
>
> Mr. Boyk reported he had few leisure activities. He stated he enjoyed going out to eat (almost every other day.) Mr. Boyk also reported he enjoyed car rides. Mr. Boyk stated he very much enjoyed painting . . . . Mr. Boyk showed this Gerontologist his collection of original art work that was on various floors of the house, including the basement.
>
> * * *
>
> [Appellee] convinced her father to see a physician. Mr. Boyk saw two physicians from the same office. Both doctors practiced under the University of Michigan Health System . . . . His diagnoses from these two visits included: Rheumatoid Arthritis, Hearing Impairment, Right Knee Pain, and Frailty. Mr. Boyk also has a history of Head Trauma from his time in the Army. Mr. Boyk was referred to a Rheumatologist . . . and went to the initial appointment. Mr. Boyk did not return . . . as he did not want to be treated with steroids . . . . Mr. Boyk was also referred to see an Audiologist regarding his hearing. At the time of this . . . interview with Mr. Boyk, he had obtained bilateral hearing aids . . . . As a result of a review of Mr. Boyk's medical records . . . , no mention of Alzheimer's Disease, Dementia, or other incapacitating conditions were mentioned [sic]. The records reflect that he was found to have "appropriate affect, alert, and oriented x 3." It should be noted that Mr. Boyk went to the

above mentioned doctors and obtained hearing aids under pressure secondary to the Court date at hand. Dr. Richardson was acutely aware of Mr. Boyk being "anti-doctor." Dr. Richardson opined that Mr. Boyk was making good decisions for what he wanted to treat. Dr. Richardson stated she witnessed no frank evidence of Dementia. Dr. Richardson went on to add that Mr. Boyk perhaps suffered from Depression or PTSD (Post Traumatic Stress Disorder.) No medications for mood or memory were mentioned or prescribed.

* * *

When Mr. Boyk was questioned about his anger, he stated he was upset about the Court proceedings and that he was very angry about the way his other children were treating [appellee]. Mr. Boyk stated repeatedly throughout the interview that he was frustrated about his adult children interfering in his life and questioning his decisions. He went on to add that he felt he was being harassed by his children . . . . This Gerontologist opines that Mr. Boyk's long-term, recent, and immediate memory functioning were within acceptable limits for his age. Mr. Boyk stated he resented that his children questioned his decision making and, therefore, wanted nothing to do with them.

* * *

Attorney Peter Staver was interviewed telephonically. Mr. Staver reported that he had been the Attorney for the execution of two separate sets of estate planning documents. The last estate planning documents were executed on November 11, 2014. Mr. Staver reported that Mr. Boyk was competent and that he had testamentary capacity when he drafted and executed his earlier Estate documents. Mr. Staver reported that Mr. Boyk was also competent in November of 2014, when he revised his estate plan. By way of interview with Mr. Boyk's various family members, it appears that they were apprised of Mr. Boyk's intention to revise his estate documents . . . .

* * *

Mr. Boyk is very angry with many of his children for filing these Petitions before the Court and for their alleged mistreatment of [appellee] . . . . It appears that Mr. Boyk's anger and his desire to have his daughter living with him are consistencies. Mr. Boyk has severed ties with his children, which appears to be his choice. Some of Mr. Boyk's children alleged [appellee] is stopping her father from having contact with them. [Appellee] denies these allegations. Mr. Boyk states that he makes his own decisions. Family members have sent the local . . . police to make an unannounced well check on their father. This . . . resulted in no significant findings . . . . Mr. Boyk's various family members wish to have a relationship with him. There appears to be a social dilemma that cannot be addressed by the Wayne County Probate Court. A family meeting is scheduled for March 13, 2016, to further discuss these matters. Mr. Boyk has taken the appropriate steps to avoid having either a Guardian or a Conservator.

In March 2016, Boyk, Janowski, and appellee entered a settlement agreement, under which Janowski agreed to withdraw her petitions for a guardianship and conservatorship, and all the parties agreed to entry of an order dismissing the guardianship and conservatorship actions with prejudice. The settlement agreement indicated that Boyk "wishe[d] to have an ongoing personal relationship with" his entire family.

Boyk died on July 27, 2016, and the parties subsequently filed competing petitions to be named personal representative of his estate. Appellants also filed a verified petition seeking to recover estate assets, alleging that appellee had exercised undue influence on Boyk, which eventually led him to execute the disputed instruments and to make *inter vivos* gifts to appellee of both real and personal property. Appellants also challenged the Lady Bird deed, arguing that it was the fruit of undue influence. The probate court conducted an evidentiary hearing during which it took judicial notice of its files from the earlier guardianship and conservatorship proceedings, including Dr. Geha's report. After considering the matter, the probate court found that appellants had failed to prove that the disputed instruments were the product of undue influence by appellee. In addition, the court rejected appellants' argument that appellee had a confidential or fiduciary relationship with Boyk at the time he executed the disputed instruments.

## II. ANALYSIS

Appellants argue that the trial court erred by disregarding the events occurring *after* Boyk executed the disputed instruments. Appellants failed to preserve the evidentiary portion of this issue by timely objecting below. See *Nahshal v Fremont Ins Co*, 324 Mich App 696, 709-710; 922 NW2d 662 (2018). Regardless, we exercise our discretion to review the issue. See *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006) (citation omitted).

> [A] trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo. An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes, but a court also necessarily abuses its discretion by admitting evidence that is inadmissible as a matter of law. [*Nahshal*, 324 Mich App at 710 (quotation marks and citations omitted).]

The probate court's factual findings are reviewed for clear error, which exists when the "reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *In re Conservatorship of Brody*, 321 Mich App 332, 336; 909 NW2d 849 (2017) (quotation marks and citation omitted). This Court "will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *Id*. (quotation marks and citation omitted).

Evidence of events occurring after Boyk executed the disputed instruments was relevant to determine whether he executed those documents as a result of undue influence. See MRE 401 (stating that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence."). "[I]n connection with other facts and circumstances," "evidence showing acts of undue influence at a date subsequent to the execution of" a disputed document may, under the right circumstances, lead to a reasonable inference that that same undue influence was also present when the document in question was executed. *Leffingwell v Bettinghouse*, 151 Mich 513, 518; 115 NW 731 (1908) (quotation marks and citation omitted). "The timeliness of the evidence of undue influence bears on the weight of the evidence and not on its admissibility." *McPeak v McPeak (On Remand)*, 233 Mich App 483, 496; 593 NW2d 180 (1999).

Appellants fail to recognize, however, that the probate court neither excluded the contested evidence as irrelevant nor held that such evidence merited no weight. Rather, the probate court made two distinct observations concerning the events occurring after execution of the disputed instruments. First, the probate court noted that evidence of a confidential or fiduciary relationship between appellee and Boyk after he executed the disputed instruments could not be used to retroactively establish a presumption of undue influence with regard to those instruments. See *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 702; 880 NW2d 269 (2015) ("the presumption of undue influence cannot be applied to questioned documents that were created before the existence of a confidential or fiduciary relationship") (quotation marks and citation omitted). Second, the probate court found that because "the majority of the incidents occurred after the [disputed instruments] were executed," "the timeline of events . . . does not support a finding of undue influence." In other words, after weighing the evidence— including evidence of events that took place after Boyk executed the disputed instruments—the probate court found that appellants had failed to carry their burdens of proof and persuasion. We find no error or clear error in those respects.

Appellants next argue that the probate court clearly erred by taking judicial notice of Dr. Geha's report. Because appellants challenge an evidentiary ruling, this Court reviews the probate court's decision to take judicial notice of Dr. Geha's report for an abuse of discretion. See *Nahshal*, 324 Mich App at 710.

Under the facts of this case, the trial court did not abuse its discretion by admitting the evidence. It has long been settled that "a probate court takes judicial notice of its own files." *In re Marxhausen's Estate*, 247 Mich 192, 199; 225 NW 632 (1929). Additionally, the contents of Dr. Geha's report were relevant to the question of undue influence. Dr. Geha related her personal observations of Boyk during an interview performed in appellee's presence, along with Boyk's comments about his relationship with his children. She also expressed expert opinions as to Boyk's mental, emotional, and physical state as of February 2016, which was more than a year after Boyk executed the last of the disputed instruments. Thus, Dr. Geha's report covered several factors that were relevant to Boyk's susceptibility to undue influence, which is a proper consideration in cases such as this one. See *In re Mikeska Estate*, 140 Mich App 116, 122; 362 NW2d 906 (1985) (affirming a probate court's finding that the testator "was not susceptible to undue influence because of his stubborn nature, suspicion of his own children, and argumentative nature"). See also *In re Estate of Karmey*, 468 Mich 68, 75 n 4; 658 NW2d 796 (2003) ("We do not exclude the possibility that, under facts other than those presented in this particular case, a person might exercise undue influence over a weakened or vulnerable spouse."). Given the report's relevance to the question of undue influence, the court did not abuse its discretion by admitting and considering Dr. Geha's report.

Finally, appellants argue that the probate court clearly erred by finding that they had failed to present sufficient evidence to establish a presumption of undue influence. Appellants further assert that the probate court clearly erred by holding that, even if appellants had established a presumption of undue influence, they nevertheless failed to present sufficient evidence of it to invalidate the disputed instruments. A probate court's factual findings with regard to allegations of undue influence are reviewed for clear error. *In re Eriskson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993).

Under MCL 700.3407(1)(c), "[a] contestant of a will has the burden of establishing . . . undue influence[.]" Moreover, it has long been recognized that a party alleging undue influence initially bears the burdens of both proof and persuasion, *Kar v Hogan*, 399 Mich 529, 539; 251 NW2d 77 (1976), holding limited in part on other grounds by *Karmey*, 468 Mich at 74, and proof of "mere opportunity" to exert undue influence is insufficient to establish that such influence was actually brought to bear, *In re Jennings Estate*, 335 Mich 241, 247; 55 NW2d 812 (1952). Still, the contestant can create a rebuttable presumption of undue influence by introducing

> evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction. [*Karmey*, 468 Mich at 73, quoting *Kar*, 399 Mich at 537.]

By establishing a rebuttable presumption of undue influence, the contestant creates a question of fact for the trier of fact. See *Bill & Dena Brown Trust*, 312 Mich App at 701.

On appeal, appellants contend there was a fiduciary relationship between Boyk and appellee based on appellee's admission that Boyk executed a power of attorney naming appellee his attorney-in-fact with regard to finances, and because appellee was appointed as Boyk's patient advocate under a medical power of attorney. As a matter of law, "an attorney in fact acting under the authority of a general power of attorney is in a fiduciary relationship with the principal," bound by the same fiduciary obligations that are incumbent upon any agent. *In re Susser Estate*, 254 Mich App 232, 235; 657 NW2d 147 (2002). Here, however, while there was testimony that Boyk had executed a power of attorney naming appellee as his attorney-in-fact with regard to finances, appellants presented no evidence regarding the duration and nature of that power of attorney, nor did they present evidence as to whether it was operative immediately or only upon the satisfaction of some condition, such as Boyk's disability. Moreover, the probate court accepted appellee's testimony that she had never actually acted as Boyk attorney-in-fact, and we will not disturb the probate court's credibility determination. In addition, although appellee admitted that she had been appointed as Boyk's patient advocate under a "medical power of attorney," there is no evidence indicating that she was acting in that capacity when Boyk executed the disputed instruments. Accordingly, we are unpersuaded by appellant's argument that a fiduciary relationship existed as a matter of law.

That is not to suggest, of course, that there was no evidence tending to support a finding that a confidential or fiduciary relationship existed *outside* of the fiduciary relationships strictly defined by law. "[W]hether there exists a confidential relationship apart from a well defined fiduciary category is a question of fact." *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App

589, 602; 792 NW2d 344 (2010) (quotation marks and citation omitted). The phrase "confidential or fiduciary relationship" is "broad," *Karmey*, 468 Mich at 74 n 3, "embrac[ing] both technical and fiduciary relations, and those informal relations which exist whenever one [person] trusts in and relies upon another," *Van't Hof v Jemison*, 291 Mich 385, 393; 289 NW 186 (1939) (quotation marks and citation omitted). The breadth of the phrase's meaning is tempered, however, by the fact that it "has a focused view toward relationships of inequality," such as when "complete trust has been placed by one party in the hands of another who has the relevant knowledge, resources, power, or moral authority to control the subject matter at issue." *Karmey*, 468 Mich at 74 n 3 (quotation marks and citation omitted). "One should not lose sight of the basic principles underlying the concept of *undue* influence." *Id*. at 75.

Here, the evidence suggests that Boyk placed a significant amount of trust in appellee at various times, placing her on his bank accounts, allowing her to handle financial matters for him, and naming her as his patient advocate. But such familial trust on Boyk's behalf is insufficient, standing alone, to find the existence of a confidential or fiduciary relationship. See *id*. at 75-76 & n 3 (holding that although marriage "is a unique relationship based on mutual trust and commitment," it does not qualify as a "confidential or fiduciary relationship" for purposes of the presumption of undue influence). See also *Salvner*, 349 Mich at 384 (finding insufficient evidence of a fiduciary relationship between a deceased father and his adult children—who had lived with him for years before his death, assisting him in his old age and disability—because it was "perfectly natural" for the children to assist their father under such circumstances, any "influence" from such laudable conduct had not been "undue," and it had not been established that the father had been "governed by their advice or that he depended on them in the making of decisions concerning his business affairs, or otherwise"). Stated differently, "the mere assisting with and conducting of testator's business affairs does not give rise to a fiduciary relationship[.]" *Id*. (quotation marks and citation omitted). Rather, such a relationship "exists only when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another." *Id*. at 384-385 (quotation marks and citation omitted).

Although there is ample evidence suggesting that Boyk placed his faith, confidence, and trust in appellee, there is no basis to disturb the probate court's finding that appellants failed to demonstrate that Boyk was also *reliant* on her for judgment or advice. This is particularly true given that the probate court had the opportunity to personally observe Boyk during the guardianship and conservatorship proceedings, which occurred after he had executed the disputed instruments. Moreover, there was significant evidence that Boyk was a strong-willed, independent individual throughout the majority of his life, and that he retained those characteristics well after he executed the disputed instruments. Further, Staver's testimony indicated that Boyk was concerned that appellee would not be able to provide for herself after his death, which strongly suggests that he would not have relied on or been influenced by her advice or counsel about financial matters. In light of such evidence, we are not definitely and firmly convinced that the probate court made a mistake when it found that appellants had failed to demonstrate that—before Boyk executed the disputed instruments—he had a confidential or fiduciary relationship with appellee.

For similar reasons, we perceive no clear error in the probate court's finding that even if appellants *had* satisfied all of the necessary elements to yield a presumption of undue influence, they nevertheless failed to meet their burden of persuasion. If a rebuttable presumption of undue

influence had arisen, appellants would have nevertheless borne "the burden of going forward with evidence that the transaction was free of undue influence." See *Kar*, 399 Mich at 542. As explained in *Kar*, 399 Mich at 542:

> If the trier of fact finds the evidence by the defendant as rebuttal to be equally opposed by the presumption, then the defendant has failed to discharge his duty of producing sufficient rebuttal evidence and the "mandatory inference" remains unscathed. This does not mean that the ultimate burden of proof has shifted from plaintiff to defendant, but rather that plaintiff may satisfy the burden of persuasion with the use of the presumption, which remains as substantive evidence, and that the plaintiff will always satisfy the burden of persuasion when the defendant fails to offer sufficient rebuttal evidence.

Appellee produced evidence rebutting any presumption of undue influence. Specifically, she presented evidence that Boyk remained a strong-willed, independent individual well after he executed the disputed instruments, that he met with Staver alone to discuss his wishes, and that he provided cogent reasons for his estate plan, i.e.*,* wishing to provide for appellee in the belief that she needed such help and the others did not. Again, paying deference to the probate court's superior fact-finding capabilities, its opportunity to judge the credibility of the witnesses, and its ability to personally observe Boyk's in-court demeanor during the guardianship proceedings, we find no basis to disturb the court's findings. "Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator." *In re Williams Estate*, 185 Mich 97, 120; 151 NW 731 (1915) (quotation marks and citation omitted). On this record, we cannot conclude that the probate court clearly erred by finding that appellee had rebutted any presumption of undue influence and that appellants had failed to prove, by a preponderance of the evidence, that appellee's influence over Boyk at the time he executed the disputed instruments was so strong as to destroy his free agency.

Affirmed. Appellee may tax costs as the prevailing party. MCR 7.219(A).

/s/ Douglas B. Shapiro
/s/ Kathleen Jansen
/s/ Michael J. Kelly

-11-