*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HEATHER WURSTER,

        Plaintiff-Appellant,

v

UNIVERSITY OF MICHIGAN REGENTS and
JEFFREY S. DESMOND, M.D.,

        Defendant-Appellees,

and

D. KERRY LAYCOCK, LLC, and DOUGLAS
KERRY LAYCOCK, also known as KERRY D.
LAYCOCK,

        Defendants.

UNPUBLISHED
November 21, 2024
2:28 PM

No. 364754
Washtenaw Circuit Court
LC No. 20-000502-CD

Before: GADOLA, C.J., and SWARTZLE and LETICA, JJ.

PER CURIAM.

Plaintiff sued defendants, University of Michigan Regents ("Michigan Medicine") and Jeffrey S. Desmond, M.D.,[1] under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. A jury found in favor of defendants. Plaintiff challenges several of the trial court's findings and decisions before and during trial. We affirm.

## I. BACKGROUND

Plaintiff began to work for Michigan Medicine in 1982. In 2000, she transferred to the Office of Clinical Affairs (OCA) within Michigan Medicine. Plaintiff was later promoted to chief administrative officer (CAO) of the OCA. Around 2016, Dr. Desmond became the chief medical

---

[1] The other defendants, including D. Kerry Laycock, LLC, and Douglas Kerry Laycock ("the Laycock defendants"), were dismissed before trial, and are not parties to this appeal.

officer, which made him plaintiff's direct supervisor. During that time, the hospital system experienced many changes, including those that affected the functions of the OCA.

Initially, plaintiff and Dr. Desmond worked well together. It is undisputed that plaintiff received "exemplary" performance evaluations from Dr. Desmond. Eventually, though, at least in plaintiff's view, the relationship began to sour. Plaintiff claimed that Dr. Desmond became frustrated or angry with her because (1) she went over his head to report an instance where he approved a significant raise for an employee whose mother was the human resources business partner of the OCA; (2) she declined to provide confidential peer-review folders to Michigan Medicine's office of the general counsel; and (3) she reported a safety issue involving a chair of surgery to Dr. David Spahlinger, Dr. Desmond's superior. In response to those actions, plaintiff alleged, Dr. Desmond began a campaign of retaliation against her by marginalizing her in the OCA, reducing her merit raise in 2018, and keeping her out of meetings.

Ultimately, Dr. Desmond spoke with Deloris Hunt, the chief human resources officer for Michigan Medicine, about conducting an organizational review of the OCA. Hunt recommended that Dr. Desmond hire Laycock, a consultant, to complete the organizational review. Dr. Desmond told plaintiff about the review before it occurred.

The contract between Michigan Medicine and the Laycock defendants provides, in relevant part, as follows:

§ 8.2 All materials conceived or prepared by [Laycock] under this Agreement including but not limited to any and all notes, designs, drawings, memoranda, reports, computer programs and code (including supporting data), and the technical data, if any, furnished by [Laycock] pursuant to this Agreement or developed by [Laycock] in connection with the performance of Services ("Work Product") shall be the property of the University. All Work Product shall be delivered to the University upon demand, and the University shall have the right to use Work Product for any purpose that it may deem desirable without the necessity of further compensating [Laycock] or any other person or persons for their use.

\* \* \*

§ 11.0 Audit. [Laycock] is responsible for keeping accurate and reasonable records related to [his] performance and obligations under this Agreement. In particular, records will be kept documenting any price, cost or budget computations required under the Agreement. [Laycock] agrees that the University or its duly authorized representative has the right to audit any directly pertinent books, documents, papers and records related to transactions and or performance of the terms and conditions of the Agreement. [Laycock] shall make available to the University or its agents all such records and documents for audit on [Laycock's] premises during regular and reasonable working hours within ten (10) business days of a written request for availability. [Laycock] agrees to either (a) allow the University to make and retain copies of those documents useful for documenting audit activity and results or (b) sequester the original or copies of those documents the University identifies for later access by the University.

Laycock met with 28 people to conduct the review, and the review resulted in a restructuring plan, which included a recommendation to eliminate plaintiff's position. Dr. Desmond met with plaintiff in May 2019 to inform her that her position was being eliminated, which he knew would surprise her, and he wanted "to give her time to think through how [they] would manage the transition." Plaintiff did not accept other offered work roles or voluntary retirement, and she was terminated from employment.

Plaintiff filed a complaint with human resources alleging discrimination and retaliation. The Office of Institutional Equity (OIE) investigated, during which the restructuring plan was paused and no other recommendations were followed. The COVID-19 epidemic also impacted the organizational review. The OIE determined that there was insufficient evidence to support plaintiff's claims.

Plaintiff then sued defendants Michigan Medicine and Dr. Desmond in June 2020. Plaintiff alleged age discrimination, sex discrimination, and retaliation under ELCRA. During discovery, plaintiff requested Laycock's handwritten notes, but Laycock had destroyed them in December 2019. Laycock explained that he had destroyed the notes in anticipation of retiring and had never been instructed to keep them. At the time of Laycock's November 2020 deposition, Laycock thought that he would retire within the following 18 months, but he had been cleaning his office to sell it. Plaintiff moved the trial court to sanction defendants for spoliation of evidence, requesting either entry of default or an adverse-inference instruction under M Civ JI 6.01. The trial court denied the request for default and reserved ruling on the jury instruction for trial.

In March 2021, Michigan Medicine and Dr. Desmond moved for summary disposition under MCR 2.116(C)(10). Plaintiff filed an amended complaint in May 2021, adding the Laycock defendants and two claims against Dr. Desmond and the Laycock defendants: Count IV, tortious interference with business relationship and expectancy, and Count V, civil conspiracy. Like the original complaint, the amended complaint was not verified. Dr. Desmond moved for summary disposition of the new counts, claiming that they were barred by governmental immunity and lacked merit. The Laycock defendants also moved for summary disposition.

During a hearing in May 2021, Judge Timothy Connors, who was presiding over the case, informed the parties that the law firm representing defendants—Miller, Canfield, Paddock, and Stone ("Miller Canfield")—was representing him in a case in which he was being sued in his official capacity in federal court. Judge Connors noted that plaintiff could move to disqualify him from the case. After a brief discussion about whether Judge Connors felt he could be unbiased, plaintiff's attorney stated that Judge Connors had "a good reputation," and he accepted that Judge Connors would be objective.

The trial court partially granted summary disposition to defendants in September 2021, dismissing Counts IV and V and the Laycock defendants, but it denied defendants' March 2021 motion for summary disposition related to the remaining counts. The parties prepared for trial.

In preparation for trial, Dr. Margaret Gyetko was deposed. She testified that she was aware of "several cases" in which female Michigan Medicine employees had been terminated without good reason. Dr. Gyetko explained that "many times women leave because they had hit the glass

ceiling." Further, Dr. Gyetko had been "shocked that very capable women were terminated" without proper due process.

In January 2022, defendants moved the trial court to preclude plaintiff from introducing evidence about which she lacked personal knowledge; the opinions of lay witnesses; "me too" evidence about the alleged discrimination of others who did not report to Dr. Desmond; and certain documents regarding damages. Plaintiff responded that evidence of a pattern or practice of discrimination within Michigan Medicine was relevant and admissible. Plaintiff explained that one such piece of evidence included a letter written to Hunt ("the Hunt memo"), which included information from five high-ranking women at Michigan Medicine that described a pattern of discrimination against older women.

At a hearing on the motion, the trial court noted that plaintiff's case was not a "class action lawsuit." The trial court explained that plaintiff could testify about her views of how she was treated, but she could not testify about overhearing of other, unrelated instances of purported discrimination. The testimony had to focus on "personal knowledge about the facts of this case." The trial court stated that they would not "try a case within a case within a case." Accordingly, the trial court granted defendants' motion as it pertained to plaintiff offering certain testimony, including about discrimination that was "not related directly to this case."

In August 2022, plaintiff moved Judge Connors to disqualify himself from the case. Plaintiff cited a separate case, referred to as "the Gammo case," which involved plaintiff's law firm—Cummings, McLorey, Davis & Acho, PLC (CMDA). In the Gammo case, a CMDA attorney missed a June 2022 hearing on an opposing party's request for a preliminary injunction. Rather than waiting for CMDA to appear, Judge Connors accepted argument and evidence before granting the preliminary injunction. The CMDA attorney later moved to set the injunction aside, which Judge Connors granted. In a hearing on the motion, Judge Connors spoke harshly about an attorney, "Suzanne," who works for CMDA and who had allegedly been unprofessional to Judge Connors decades earlier when he was a practicing attorney.

Plaintiff's counsel sent a letter to Judge Connors, asking him to disqualify himself from CMDA's cases on the basis of his "deep-seated antagonism." Plaintiff moved Judge Connors to disqualify himself from the present case on August 25, 2022. Defendants opposed the motion, arguing that plaintiff had not timely filed her motion and had not shown that Judge Connors was biased against plaintiff or her attorneys.

At a hearing on the motion, plaintiff's counsel noted that Judge Connors had already agreed to disqualify himself from the Gammo case and that the judge's behavior during the Gammo disqualification hearing showed that he was angry and offended. Plaintiff's counsel argued that he had originally not found Judge Connors's representation by Miller Canfield to be an issue, but counsel had not known at the time about Judge Connors's "ill feelings and bad experiences" involving plaintiff's counsel's firm. Judge Connors insisted that he did not have any negative feelings toward CMDA or plaintiff and denied plaintiff's motion.

Plaintiff then sought review by Chief Judge Carol Kuhnke, arguing that Judge Connors's bias was further exhibited by his relationship with Miller Canfield. Chief Judge Kuhnke declined to consider the argument about Miller Canfield, because plaintiff had not raised it in the motion to

disqualify Judge Connors. Chief Judge Kuhnke affirmed Judge Connors's decision because plaintiff had not established bias or showed a violation of the Michigan Code of Judicial Conduct.

The case proceeded to jury trial. At trial, Dr. Desmond denied that any of the incidents raised by plaintiff had an underlying nefarious purpose, and he claimed that the organizational review was conducted solely to help the OCA restructure in light of changes that occurred around it. Plaintiff's position was eliminated because it was no longer necessary, and the decision had nothing to do with her performance. Defendants also presented evidence showing the age and gender composition of 12 OCA employees, including plaintiff. Eight of the other employees were women, and seven of the other employees were older than plaintiff.

Plaintiff introduced evidence through several witnesses about her positive work performance and critical role with the OCA to argue that her firing and other adverse employment actions must have been the result of discrimination or retaliation. Plaintiff also introduced her annual evaluations to prove that she was rated as exemplary.

Dr. Gyetko testified that she had a working relationship with plaintiff, and plaintiff was "really outstanding" as a leader. Dr. Gyetko had, at one point, nominated plaintiff for an administrator-of-the-year award. Dr. Gyetko also testified that she had begun working at the University of Michigan as an intern in 1981, and she had faced sexism throughout her career. When asked for specifics, defense counsel objected on the basis that it was irrelevant unless it related to discrimination against plaintiff. The trial court ruled that Dr. Gyetko could only testify "about why she thinks there's discrimination in this case."

Defendants countered plaintiff's evidence about her positive job performance, over plaintiff's repeated objections, by introducing evidence from various witnesses showing that there were differing opinions about the quality of plaintiff's work, including that she was disrespectful to those who worked below her, and that the organizational review was not a "sham."

Further, Laycock testified about his review process and Dr. Desmond's request that Laycock provide recommendations for how to improve the OCA. Laycock thought that Dr. Desmond "was very reluctant to talk to [him] about anyone in the office" so that Laycock would be able to objectively assess the organization. Dr. Desmond did not comment on any employee performance or talk about eliminating positions before Laycock conducted his review.

It stood out to Laycock after his interview with plaintiff that she had many responsibilities, but the responsibilities did not fit together for an executive role, so there was not role clarity or a "clear functional responsibility." Laycock was also struck by plaintiff's emotion during the interview as she described "grieving for the loss of her role." Laycock testified that he was confused by plaintiff's title of CAO because that was not a regular role within the university, and it seemed to be a "self-selected" title. Further, plaintiff was elsewhere classified as a director, executive director, or associate hospital administrator. Ultimately, Laycock determined that plaintiff's role was poorly defined and "an unnecessary layer of executive management." Laycock's findings were not based on how well plaintiff performed her job.

Laycock issued his preliminary recommendations in February 2019, and plaintiff was terminated in June 2019 after Laycock was no longer involved. In summer 2019, Laycock was

interviewed as part of the OIE investigation. The investigator told Laycock that plaintiff had made allegations of discrimination, but it did not occur to Laycock that litigation would result. In fall 2019, Laycock asked Hunt if the project was going to continue, and Hunt said that it might because the OIE investigation had issued a report, but then Laycock did not hear anything further.

Laycock had been considering retirement, and he decided that it was time to downsize his office. Over the holidays near the end of 2019, he cleaned out his files, which included his file for this case. Laycock disposed of "probably thirty feet" of files, and he sold his cabinets and some furniture. Laycock was going to sell his office, but then COVID occurred, so he did not list it for sale. At the time of trial, however, the office had "been on the market for a while." At the time he cleaned out his office, Laycock had not heard from anybody about potential litigation and nobody had told him to preserve his notes. The first time anyone asked him for documentation was in 2020.

Laycock had taken notes during his interviews, although he did not take notes during his initial meetings with Dr. Desmond. He did not think that there was anything "crucial" from the notes that he did not put into his preliminary findings or report. He testified that there was nothing in the notes that related to the issue of discrimination or retaliation, and neither Dr. Desmond nor Hunt ever did anything to lead Laycock to believe that they were retaliating or discriminating against plaintiff.

Tanesia White, a senior investigator in the equity, civil rights, and Title IX office, previously the OIE, testified that she had investigated plaintiff's claims of discrimination. White did not find sufficient evidence to support the allegations. Plaintiff's counsel objected to White testifying, on the basis that the trial court had already ruled that he could not cross-examine her about evidence of other discrimination within the university. The trial court overruled the objection. Plaintiff's counsel explained that he was being "unfairly prejudiced" and determined not to cross-examine White.

When introduction of evidence was complete, plaintiff requested the adverse-inference instruction under M Civ JI 6.01. The trial court denied the request because Laycock had provided a reasonable excuse for the destruction of the notes. After the trial court instructed the jury, plaintiff's counsel stated, "You know what, Judge, this trial ran like a well-oiled machine and that's due in large part to you."

The jury found that defendants were not liable for any of plaintiff's claims, and the trial court issued a judgment comporting with the verdict.

Plaintiff now appeals.

## II. ANALYSIS

### A. MCL 600.6431

For the first time in this lawsuit, defendants argue on appeal that plaintiff's complaint should be dismissed for failure to comply with the notice-and-verification requirement of MCL 600.6431, which provides, in part:

(1) Except as otherwise provided in this section, a claim may not be maintained against this state unless the claimant, within 1 year after the claim has accrued, files in the office of the clerk of the court of claims either a written claim or a written notice of intention to file a claim against this state or any of its departments, commissions, boards, institutions, arms, or agencies.

Under MCL 600.6431(2)(d) the claim or notice must contain "[a] signature and verification by the claimant before an officer authorized to administer oaths." Our Supreme Court has explained that "MCL 600.6431(1) applies to all claims against the state, including those filed in the circuit court, except as otherwise exempted in MCL 600.6431 itself." *Christie v Wayne State Univ*, 511 Mich 39, 52; 993 NW2d 203 (2023). The "lone exception" to this requirement is for claims under the wrongful imprisonment compensation act. *Id*. at 56. See MCL 600.6431(5).

Failure to comply with the notice-and-verification requirement of MCL 600.6431 requires dismissal of a case. *Elia Cos, LLC v Univ of Mich Regents*, 511 Mich 66, 75; 993 NW2d 392 (2023). In *Elia Cos*, 511 Mich at 74-75, the Court recognized that a plaintiff may amend and properly verify a complaint within the deadline in MCL 600.6431, but a plaintiff must still comply with the statute's requirements to avoid dismissal when suing the state. See also *Progress Mich v Attorney General*, 506 Mich 74, 92, 95; 954 NW2d 475 (2020). Our Supreme Court has explained:

[S]ince 1941, a claim may not be maintained against the state unless the claimant timely files, with the clerk of the Court of Claims, a written claim or notice of intention to file a claim. In 2020, the Legislature identified the lone exception to the notice requirement for WICA claims. In carving out WICA claims, the Legislature could have also removed ELCRA or [persons with disabilities civil rights act] PWDCRA claims from MCL 600.6431's reach. It did not do so, providing further evidence that it intended the notice requirement to apply to such claims. [*Christie*, 511 Mich at 56-57.]

It is undisputed that plaintiff's original complaint and amended complaint are not verified, and plaintiff has not claimed to have filed a verified notice with the court of claims. Instead, plaintiff argues on appeal that defendants' failure to raise this defense in the trial court was a relinquishment of the defense, relying on *Progress Mich*, 506 Mich at 92-93. In *Progress Mich*, 506 Mich at 92, however, the "defendant stated affirmatively that the amended complaint was properly verified multiple times throughout the course of th[e] litigation," and the defendant was "specifically invited at oral argument in [the] Court to argue that the amended complaint was not verified," but declined to do so. The record does not indicate here that defendants have ever conceded proper verification or notice under MCL 600.6431.

Further, our Supreme Court has held that an unverified notice was defective and "a complete defense that may be raised at any time by a defendant entitled to governmental immunity." *Fairley v Dep't of Corrections*, 497 Mich 290, 292; 871 NW2d 129 (2015). In *Fairley*, 497 Mich at 300, the plaintiff argued that the defendant waived its claim for summary disposition on the basis of notice when it failed to raise the issue as an affirmative defense. The Court held that the state defendant need not raise as an affirmative defense the defective nature of a notice. *Id*. Instead, the Court explained that a plaintiff "must adhere to the conditions precedent in MCL 600.6431(1) to successfully expose the defendant state agencies to liability." *Id*. at 297-298.

Moreover, this Court has recently held that the holding in *Christie* applies retroactively because it did not constitute a new rule, but, instead, "declared the meaning of the law as it existed, based on the unambiguous statutory language, and corrected a relatively short-lived misinterpretation of the law." *Flamont v Dep't of Corrections*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367863); slip op at 6. Accordingly, this Court held in *Flamont* that it was erroneous for the trial court not to give *Christie* retroactive effect. *Id*.

In this case, because plaintiff did not verify her complaint or file a verified notice with the court of claims, and we are well beyond the one-year notice requirement of MCL 600.6431, plaintiff's claims against Michigan Medicine would be subject to dismissal, had the jury not already found them not to be liable in this case. Regardless, plaintiff cannot maintain her claims against Michigan Medicine, and her arguments on appeal with respect to Michigan Medicine must fail. See *Fairley*, 497 Mich at 292; *McCahan v Brennan*, 492 Mich 730, 742; 822 NW2d 747 (2012).

The claims against Dr. Desmond arguably present a closer call. In *Pike v Northern Mich Univ* 327 Mich App 683, 697-698; 935 NW2d 86 (2019), this Court explained that MCL 600.6431 specifically applies to claims against "the state," rather than to a state employee sued in his personal capacity. Accordingly, this Court held that the requirements in MCL 600.6431 did not apply to that plaintiff's gross-negligence claim against the university employee because it was not a claim against the state, either directly or as an official-capacity claim. *Id*. at 698. The requirements would, however, apply to a state actor sued in his official capacity, given that such a suit would effectively be against the state.

Although not clear from the pleadings or trial, it would appear that plaintiff's claims against Dr. Desmond would have had to have been pleaded in his official capacity as a physician and manager of employees with Michigan Medicine. Under this understanding, the claims against Dr. Desmond would also be subject to dismissal for failure to comply with MCL 600.6431. With that said, because the record below is not explicit on this point and out of an abundance of caution, we will assume arguendo for purposes of this appeal only that plaintiff's claims against Dr. Desmond were made in his personal capacity and, therefore, consider the remaining arguments on appeal as those pertain solely to Dr. Desmond.

## B. JUDICIAL DISQUALIFICATION

With respect to Dr. Desmond, plaintiff first argues that the trial court abused its discretion by denying her motion to disqualify Judge Connors. When reviewing a motion to disqualify a trial court judge, we review for an abuse of discretion the trial court's factual findings. *In re Contempt of Henry*, 282 Mich App 656, 679; 765 NW2d 44 (2009). A trial court abuses its discretion when it chooses an outcome outside of the range of principled outcomes. *Nowacki v Dep't of Corrections*, 319 Mich App 144, 148; 900 NW2d 154 (2017).

"Due process requires that an unbiased and impartial decision-maker hear and decide a case." *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153 (2012). It is presumed, however, that judges are unbiased, and a party alleging that a bias exists bears a heavy burden to overcome that presumption. *Id*. MCR 2.003(C)(1)(a) provides for disqualification if a "judge is biased or prejudiced for or against a party or attorney." Under MCR 2.003(C)(1)(b),

disqualification is warranted when a judge has "a serious risk of actual bias impacting the due process rights of a party."

Plaintiff argues that Judge Connors's disclosure of Miller Canfield's representation "planted a reasonable basis for concern regarding his ability to fairly umpire this case," and, although plaintiff's counsel at first gave Judge Connors "the benefit of the doubt," the Gammo situation showed his "deep-seated anger" toward CMDA warranting disqualification.

Defendants argue that plaintiff's motion to disqualify was untimely. A "motion[] for disqualification must be filed within 14 days of the discovery of the grounds for disqualification." MCR 2.003(D)(1)(a). See also *TT v KL*, 334 Mich App 413, 433; 965 NW2d 101 (2020). An untimely motion may, however, be granted for good cause shown. MCR 2.003(D)(1)(d). Plaintiff filed her motion on August 25, 2022, relying on hearings that occurred before Judge Connors in the Gammo case on June 23, 2022 and July 28, 2022, both dates more than 14 days earlier. Defendants raised this issue in the trial court, but neither judge decided the motion on that ground, instead addressing the substance of the claims. Plaintiff's motion was untimely, however, and it is a factor that can be considered in determining whether to grant a motion for disqualification. See MCR 2.003(D)(1)(d).

Neither judge abused their discretion in denying plaintiff's motion to disqualify Judge Connors. "Judicial comments and rulings . . . do not provide a basis for disqualification unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Molnar v Tenacity Farms, Inc*, 345 Mich App 390, 403; 5 NW3d 90 (2023) (cleaned up). Judge Connors acknowledged that he made the statements that plaintiff challenged in her motion for disqualification, but denied that it showed a bias against CMDA. Moreover, at the Gammo hearing in which Judge Connors discussed "Suzanne," Judge Connors actually granted the relief sought by the CMDA attorney. Plaintiff contends that this favorable decision was not indicative of Judge Connors's impartiality because there was no legal basis for denying the relief requested, but the concern about potential judicial bias is that the judge will make decisions not based in law. Plaintiff argues that Judge Connors's disqualification in the Gammo case supports disqualification in the present case. In the Gammo case, however, opposing counsel did not oppose the motion, and that disqualification does not alone establish that he was required to disqualify himself in this case.

As to Judge Connors's representation by Miller Canfield, "[p]arties to the proceeding may waive disqualification even where it appears that there may be grounds for disqualification of the judge." MCR 2.003(E). Plaintiff had previously waived the issue regarding Miller Canfield's representation of Judge Connors. Plaintiff argues, however, that Judge Connors's "acquiescence to Miller Canfield's preference," opposing plaintiff's motion for disqualification in this case, "reinforces the justification for CMDA's legitimate concern of biased umpiring." As defendants argue on appeal, however, Judge Connors made rulings against defendants in this case, including denying a motion for summary disposition and partially denying a motion in limine. Plaintiff has not established bias or prejudice to warrant disqualification.

C. PATTERN-AND-PRACTICE EVIDENCE

Plaintiff next argues that the trial court abused its discretion by precluding evidence of Michigan Medicine's pattern and practice of discriminating on the basis of age and gender. We review for an abuse of discretion a trial court's decision about the admission of evidence. *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 333 Mich App 457, 477; 960 NW2d 186 (2020). "We review de novo preliminary or underlying questions of law." *Id*. at 478.

Generally speaking, relevant evidence is admissible and irrelevant evidence is not. MRE 402.[2] "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even when evidence is relevant, however, it may be excluded under MRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "The Supreme Court has noted that MRE 403 does not prohibit prejudicial evidence but only prohibits evidence that is unfairly prejudicial." *In re Piland*, 336 Mich App 713, 733; 972 NW2d 269 (2021). Unfair prejudice "arises if there is a danger that marginally probative evidence will be given undue weight by the jury." *Id*.

Plaintiff argues that defendants were permitted to present statistical evidence about the age-and-gender composition of employees, to which she was not permitted to respond. Plaintiff did not, however, proffer evidence that Dr. Desmond had discriminated against other employees who reported to him. Her intent to offer general concerns about the hospital were not directly relevant to her claims against Dr. Desmond. Even if every allegation that plaintiff made about the other purported victims of discrimination were true, there is no basis here to find that Dr. Desmond was responsible for other departments in the hospital or that the claims related to his decision in this case. Likewise, Dr. Gyetko's deposition testimony suggested that others may have experienced a glass ceiling within the hospital, but this does not show a pattern and practice related to plaintiff's claims. Similarly, the writers of the Hunt Memo did not work in the OCA and did not report to Dr. Desmond.

Further, although plaintiff argues that she was not able to cross-examine White about pattern evidence, plaintiff has not shown that she was prevented from cross-examining White as it related to the investigation on plaintiff's claims. Defense counsel did not cross-examine White at all, and plaintiff has not shown that any of her proposed evidence would have detracted from White's findings.

Plaintiff's proffered evidence was, at best, minimally relevant to her claims. Plaintiff relies on *Sprint/United Mgt Co v Mendelsohn*, 552 US 379, 388; 128 S Ct 1140; 170 L Ed 2d 1 (2008), in which the United States Supreme Court held that the admissibility of evidence about discrimination by other supervisors in an individual's discrimination case was "fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." Under the federal rules of evidence about relevance and prejudice, such evidence could not be per se admissible or inadmissible. *Id*. Here, however, the

---

[2] The Michigan Rules of Evidence were amended effective January 1, 2024. Although the rules at issue here remain substantially similar, we will consider the rules in effect at the time of trial.

trial court properly considered the specific proposed evidence and found that it was not admissible "for *this* case." (Emphasis added.) And because the evidence did not relate to OCA employees who reported to Dr. Desmond, it was not a direct response to defendants' admission of evidence about the age-and-gender composition of OCA employees. Therefore, the trial court did not abuse its discretion by excluding the evidence.

Moreover, there is no reason to find that even if the trial court erred by excluding the evidence, the outcome of the trial would have differed. "A trial court's error is harmless if, based on review of the entire record, it is more probable than not that the error was not outcome-determinative; if the probability runs in the other direction, then it is reversible error." *Nahshal v Fremont Ins Co*, 324 Mich App 696, 717; 922 NW2d 662 (2018). "Our courts are reluctant to overturn a jury's verdict, particularly if there is ample evidence to justify the jury's decision, and we will not do so on the basis of an erroneous evidentiary ruling unless refusal to take this action would be inconsistent with substantial justice." *Krohn v Sedgwick James of Mich, Inc*, 244 Mich App 289, 295; 624 NW2d 212 (2001).

In this case, there was ample evidence to justify the jury's decision, and the jury had the opportunity to hear evidence in plaintiff's favor. Moreover, although Dr. Gyetko was not permitted to provide specifics, she testified that she had experienced sexism at Michigan Medicine. The jury heard from many witnesses, and there is no basis from which to find that the outcome would have differed had the jury heard generalized concerns about discrimination at Michigan Medicine.

## D. SPOLIATION OF EVIDENCE

Plaintiff next argues that the trial court abused its discretion by declining to give a spoliation-of-evidence jury instruction. We generally review de novo claims of instructional error. *Komendat v Gifford*, 334 Mich App 138, 149 n 3; 964 NW2d 75 (2020). We will, however, only disturb an instruction about spoliation of evidence when we find a clear abuse of discretion. *Id*.

"A litigant is under a duty to preserve evidence that it knows or reasonably should know is relevant to an action, and failure to preserve that evidence can result in a sanction in the form of a spoliation instruction." *Id*. at 150 (cleaned up). See also *Brenner v Kolk*, 226 Mich App 149, 161-162; 573 NW2d 65 (1997). Plaintiff requested an instruction on an adverse inference, which "permits the fact-finder to conclude that the missing evidence would have been adverse to the opposing party." *Pugno v Blue Harvest Farms LLC*, 326 Mich App 1, 24; 930 NW2d 393 (2018).

Dr. Desmond argues on appeal that plaintiff failed to prove that defendants or Laycock destroyed the evidence with a culpable mind. Although a party must establish intentional misconduct to obtain an instruction on an adverse *presumption*, see *Ward v Consol Rail Corp*, 472 Mich 77, 85-86; 693 NW2d 366 (2005), plaintiff did not request an adverse *presumption*, but, instead, requested M Civ JI 6.01, providing for an adverse *inference*. An adverse inference is warranted when a party has failed to produce evidence and "(1) the evidence was under the party's control and could have been produced; (2) the party lacks a reasonable excuse for its failure to produce the evidence; and (3) the evidence is material, not merely cumulative, and not equally available to the other party." *Ward*, 472 Mich at 85-86.

The trial court found that there was a reasonable excuse for the destruction of the evidence, warranting a denial of plaintiff's request to instruct the jury on M Civ JI 6.01. It was undisputed that Laycock destroyed his handwritten notes before litigation began. Plaintiff argues that defendants knew that there was the potential for litigation at the time that Laycock destroyed the notes because plaintiff had already filed a complaint with the OIE, but, as Dr. Desmond argues in response, at the time that Laycock destroyed the notes, OIE had already concluded its investigation, and plaintiff had not shared her intention to sue.

Laycock testified that he destroyed the notes because he was contemplating retirement, wanted to sell his office, and needed to clear it out. Laycock destroyed years of notes, which happened to include the handwritten notes related to his work for Michigan Medicine and Dr. Desmond. Had plaintiff produced evidence that Laycock only destroyed notes related to this case or received communication from someone at Michigan Medicine instructing him to destroy the notes, the outcome may differ. Moreover, Laycock testified that he had reduced his handwritten notes to an electronic version and that all of the relevant information from his handwritten notes were placed into an electronic document. Plaintiff has not disputed that she was provided access to this electronic data during discovery, and there is no reason to find that Laycock's testimony was untrue.

Although there may be instances when a complaint filed with the OIE (or an institution's equivalent office) could put a party on sufficient notice of potential litigation so as to warrant requiring the preservation of records, the trial court considered the matter and concluded otherwise. An abuse of discretion is a high bar to show on appeal, and plaintiff has not done so here. Laycock provided a reasonable explanation for destroying his notes, and it was not an abuse of discretion for the trial court to deny plaintiff's request for an adverse-inference instruction.

### E. EVIDENCE OF PLAINTIFF'S JOB PERFORMANCE

Finally, plaintiff argues that the jury was improperly permitted to consider negative testimony about her personality and job performance when defendants otherwise claimed that her termination was only due to the reorganization of the OCA.

"Once either party has put some fact into evidence, the other party has an unquestioned right to fully develop all facts and circumstances surrounding the subject matter." *Olweean v Wayne Co Road Comm*, 385 Mich 698, 702; 190 NW2d 108 (1971). This Court has explained that, to be relevant, a material fact need not be an element of a cause of action, but, instead, it is enough if the fact is " 'in issue' in the sense that it is within the range of litigated matters in controversy." *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 667; 819 NW2d 28 (2011).

At trial, plaintiff placed her performance at issue. Plaintiff's main argument was that defendants must have either discriminated against her or retaliated against her because there was no other possible reason to fire plaintiff. In an attempt to convince the jury of this, plaintiff called witnesses to speak about her excellent performance and that she was necessary to the operation of the OCA. Plaintiff also introduced her annual evaluations by Dr. Desmond to prove that she was rated as exemplary, testified about how well she performed in her role, and elicited testimony about being nominated for administrator of the year in 2012.

Defendants countered this image by introducing evidence from various witnesses showing that there were differing opinions about the quality of plaintiff's work and that the organizational review was not a "sham." Despite defendants not alleging that plaintiff was fired because of her performance, plaintiff made the fact of whether she was a good employee "a fact of consequence to the action." *Id*.

Plaintiff alternatively contends that the negative evidence of her performance should have been excluded under MRE 403 because the evidence was unfairly prejudicial in that it allowed defendants to, at trial, create additional reasons for having fired plaintiff and put plaintiff in a bad light in front of the jury. Defendants have never, however, claimed that plaintiff was fired due to her performance, but were, instead, properly responding to plaintiff's introduction of evidence about her positive work history.

There could, however, be a danger of unfair prejudice if the jury considered the evidence and decided that plaintiff's performance was an appropriate, nondiscriminatory reason for her firing, rather than because of the organizational restructuring. Plaintiff argues on appeal that there existed a danger that the jury would decide the case on the basis that they did not like her. Nevertheless, MRE 403 does not require the exclusion of evidence solely because a danger of unfair prejudice exists. See *In re Piland*, 336 Mich App at 733. Instead, the risk of unfair prejudice must substantially outweigh the probative value of the evidence. MRE 403. Given the probative value of the evidence, the trial court did not abuse its discretion by admitting the evidence.

Affirmed.

/s/ Michael F. Gadola
/s/ Brock A. Swartzle
/s/ Anica Letica

-13-